KENNETH A. APPLEBY *vs.* DAILY HAMPSHIRE GAZETTE
(and three companion cases[1]).

Hampshire. February 6, 1985. — May 28, 1985.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Libel and Slander. Newspaper. Practice, Civil,* Summary Judgment. *Negligence,* Newspaper.

A newspaper which received news articles from a reputable wire service concerning a person who was the subject of a murder investigation had no duty to corroborate the information in the articles before republishing them verbatim, where the articles were not so inherently improbable or inconsistent that the newspaper had, or should have had, reason to doubt their veracity. [36-42]

CIVIL ACTIONS commenced in the Superior Court Department, two on May 18, 1981, and two on May 28, 1981, respectively.

The cases were heard by *James P. Lynch, Jr.,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Richard M. Howland* for the plaintiff.

*James Heigham (Frank Libby, Jr., & Alexandra Leake* with him) for the Daily Hampshire Gazette & others.

*Charles Donelan,* for The Associated Press, *& William Darrin,* for United Press International, Inc., amici curiae, submitted a brief.

*Gerald May, Sr., Michael J. McHugh & Mark C. O'Connor,* for The Hearst Corporation, amicus curiae, submitted a brief.

HENNESSEY, C.J. In 1981 and 1982, Kenneth A. Appleby commenced approximately ninety-four separate actions, alleg-

---

[1] Kenneth A. Appleby *vs.* Holyoke Transcript-Telegram, Kenneth A. Appleby *vs.* Medford Daily Mercury & another, and Kenneth A. Appleby *vs.* Boston Globe & others.

ing that various newspapers, radio and television stations, and individuals had made false and defamatory statements about him. The statements concerned a criminal investigation which culminated in Appleby's convictions for assault and battery, rape, and kidnapping. See *Commonwealth* v. *Appleby*, 389 Mass. 359, cert. denied, 464 U.S. 941 (1983); *Commonwealth* v. *Appleby*, 380 Mass. 296 (1980). A judge of the Superior Court entered final summary judgment on behalf of four of the newspapers: the Daily Hampshire Gazette, the Holyoke Transcript-Telegram, the Medford Daily Mercury, and the Boston Globe (defendants).[2] Because we agree with the judge that reasonable reliance on the accuracy of stories obtained from a reputable wire service does not give rise to a triable issue of negligence, we affirm the judgments of the Superior Court.

The uncontroverted facts, as established by the materials submitted by the parties for the purposes of the summary judgment motions, are as follows. On June 13, 1978, Massachusetts State police Corporal William A. Garvin executed an affidavit in support of an application for a warrant authorizing a search of Appleby's home and property in West Springfield. The affidavit included three single-spaced pages detailing Garvin's conversation with two New York City police officers. According to the affidavit, an individual identified as "informant #1" reported that he had lived with Appleby for several months in Appleby's home. Informant #1 admitted that he had assisted Appleby in kidnapping, beating and raping a man from New York City. He further stated that Appleby had murdered someone else, and that Appleby had buried the body in the cesspool in his backyard. Another individual identified in the affidavit as "informant #2," who was the victim of the alleged kidnapping described by informant #1," corroborated the story. Informant #2 stated that Appleby had threatened to kill him and that Appleby had admitted killing "many others."

---

[2] The judge also allowed in part, and denied in part, the motion of the Boston Herald American for summary judgment. The Appeals Court dismissed Appleby's appeal from the entry of partial summary judgment in favor of this defendant, on the ground that the appeal was interlocutory. See *Rollins Envtl. Servs.* v. *Superior Court*, 368 Mass. 174, 178-179 (1975).

On the basis of the reports from these two informants, as well as certain other facts set forth in the affidavit, a warrant was issued by the District Court of Springfield on June 13, 1978. The search began on the same day. The police seized a variety of weapons and sadomasochistic devices from Appleby's home, and began to dig up Appleby's property with a backhoe in what proved to be a fruitless search for bodies.

On June 14, reports of the search for bodies on Appleby's premises were transmitted by both United Press International (UPI) and Associated Press (AP). On the same day, the Medford Daily Mercury republished the UPI story verbatim, while the Boston Globe, the Daily Hampshire Gazette, and the Holyoke Transcript-Telegram republished stories from AP verbatim. Between June 14, 1978, and May 20, 1981, the four newspapers republished approximately forty additional stories from the wire services. As established by uncontroverted affidavits submitted by all four defendants, both AP and UPI enjoy "excellent reputation[s] for accuracy throughout the newspaper industry."

In addition to the wire service stories, on June 14 and 15, 1978, the Boston Globe printed three articles about Appleby which were written by staff members. The Daily Hampshire Gazette printed a single staff article on June 16, 1978. Other media organizations also covered the search of Appleby's property in some detail.

Appleby brought ninety actions in 1981, and four additional actions in 1982. He alleged that he had been defamed by a number of false statements which had been broadcast or printed in the course of the publicity about the search of his house and backyard.[3] In response to interrogatories propounded by the defendants, Appleby listed the allegedly false statements. In essence, he claims to have suffered damage from the broadcast

---

[3] Appleby's complaints also allude to the tort of invasion of privacy. The judge apparently concluded, however, that even when "[g]iven an indulgent reading," the complaints failed to state a claim under any theory other than defamation. Appleby has not challenged on appeal the judge's refusal to consider his privacy claims.

or publication of false statements about his homosexuality, about the torture and murder of young homosexual men, about admissions made to the police concerning bodies being buried on his property, about his interest in the Nazi party and Nazi paraphernalia, and about the condition of his house.

On October 3, 1983, thirty-three newspapers which had been sued by Appleby filed motions for summary judgment.[4] The motions were granted, on the ground that no jury could reasonably find that the newspapers acted negligently in merely reprinting stories obtained from reputable wire services. The judge also ruled that the stories were privileged as fair and accurate summaries of the contents of an affidavit in support of a search warrant. See *Sibley* v. *Holyoke Transcript-Telegram Publishing Co.*, 391 Mass. 468, 471 (1984).

The judge only entered final summary judgment in four of these thirty-three cases, including the case against the Medford Daily Mercury. Because he considered that case "to be fairly representative" of the remaining twenty-nine cases which had been brought before him, "and in order to avoid unnecessary costs and delays on appeal," the judge directed the clerk-magistrate not to enter summary judgment in the remaining cases until an appellate court affirmed the grant of the Medford Daily Mercury's motion for summary judgment. Appleby appealed the four cases in which final summary judgment had been entered, and the cases were consolidated in the Appeals Court. We then transferred the cases to this court on our own motion.

In *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 347 (1974), the United States Supreme Court held that, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Shortly thereafter, in *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849 (1975), we concluded that "private persons . . . may recover compensation on proof of *negligent*

---

[4] At the time of this appeal, most of the other cases against non-newspaper defendants were still pending.

publication of a defamatory falsehood" (emphasis in original). *Id.* at 858. See, e.g., *Schrottman* v. *Barnicle*, 386 Mass. 627, 630 (1982); *Cefalu* v. *Globe Newspaper Co.*, 8 Mass. App. Ct. 71, 75-76 (1979), appeal dismissed and cert. denied, 444 U.S. 1060 (1980).[5] The judge below ruled that the verbatim republication of an article from a reputable wire service could not, as a matter of law, constitute negligence, unless the article appears, on its face, to be inherently improbable. He thus concluded that the defendants were entitled to summary judgment with respect to those statements taken verbatim from AP or UPI. We agree.

Generally speaking, the republisher of a defamatory statement "is subject to liability as if he had originally published it." Restatement (Second) of Torts § 578 (1977). *Schiavone Constr. Co.* v. *Time, Inc.*, 735 F.2d 94, 96 (3d Cir. 1984). *Cianci* v. *New Times Publishing Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980). See *Sanford* v. *Boston Herald-Traveler Corp.*, 318 Mass. 156, 160 (1945); Painter, Republication Problems in the Law of Defamation, 47 Va. L. Rev. 1131, 1150 (1961). This rule does not, however, excuse the plaintiff in a case such as this one from making the constitutionally required showing of fault on the part of the publisher. If no jury could reasonably find that the defendants acted with the requisite fault in republishing the wire service reports about Appleby, summary judgment with respect to the statements taken from the wire services is appropriate.

Under the negligence standard adopted in *Stone* v. *Essex County Newspapers, Inc., supra*, the defendants are required to act "reasonably in checking on the truth or falsity . . . of the communication before publishing it." Restatement (Second) of Torts § 580B comment g (1977). See *Schrottman* v. *Bar-*

---

[5] The defendants have not attempted to argue that Appleby is a "limited public figure," for the purposes of this suit, see *Lyons* v. *New Mass Media, Inc.*, 390 Mass. 51, 55 (1983), and thus that Appleby is required to show knowing or reckless disregard for the truth. *Id.* at 56. Nor have the defendants argued that Appleby, in light of his criminal convictions, is libel-proof. See *Jackson* v. *Longcope*, 394 Mass. 577, 580 (1985).

*nicle, supra* at 641-642; *Triangle Publications, Inc.* v. *Chumley*, 253 Ga. 179, 181 (1984).[6] "Customs and practices within the profession are relevant in applying the negligence standard." Restatement (Second) of Torts, *supra*. However, "custom is not controlling." *Id. Schrottman* v. *Barnicle, supra* at 641 ("Negligence throughout a trade should not excuse its members from liability"). See *Triangle Publications, Inc.* v. *Chumley, supra; Kohn* v. *West Hawaii Today, Inc.*, 65 Hawaii 584, 588-590 (1982).

"[B]ecause of the jury's 'unique competence in applying the reasonable man standard,'" summary judgment is rarely appropriate with respect to the merits of a negligence case. *Foley* v. *Matulewicz*, 17 Mass. App. Ct. 1004, 1005 (1984), quoting 10A C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2729, at 194 (2d ed. 1983). The defendants here are "required to establish that on the evidence brought forward, considered with an indulgence in the plaintiff's favor, a jury could not reasonably conclude" that the defendants had acted negligently. *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 231 (1979), cert. denied, 446 U.S. 935 (1980). Nonetheless, in appropriate situations and with due regard for First Amendment concerns, courts have not hesitated to grant summary judgment for defendants in defamation actions. *Id.* at 231 & n.14, citing *Nader* v. *deToledano*, 408 A.2d 31, 42-45 & n.7 (D.C. App. 1979), cert. denied, 444 U.S. 1078 (1980). See *McBride* v. *Merrell Dow & Pharmaceuticals Inc.*, 717 F.2d 1460, 1466-1467 (D.C. Cir. 1983). Allowing a trial to take place in a meritless case "would put an unjustified and serious damper on freedom of expression." *National Ass'n of Gov't Employees, Inc., supra* at 233. See also *Cefalu* v. *Globe Newspaper Co., supra* at 74. Weighing all the factors, we conclude that, in ordinary

---

[6] In light of our conclusion about the defendants' alleged negligence with respect to verifying the accuracy of the articles, we need not decide whether the plaintiff, in a case such as this, must also show negligence with respect to the articles' defamatory character. See *Schrottman* v. *Barnicle, supra* at 640.

circumstances, no jury could reasonably find that a newspaper had acted negligently in relying on the accuracy of a story from a reputable wire service. Our conclusion is consistent with cases in other jurisdictions which have considered the question. *Layne* v. *Tribune Co.*, 108 Fla. 177, 186 (1933). *MacGregor* v. *Miami Herald Publishing Co.*, 119 So. 2d 85 (Fla. Dist. Ct. App. 1960). *Torres-Silva* v. *El Mundo*, 106 D.P.R. 415 (P.R. 1977), translated and reprinted in 3 Media L. Rep. (BNA) 1508 (1977). See also *Mehau* v. *Gannett Pac. Corp.*, 66 Hawaii 134, 149 (1983) (malice not shown where newspaper merely republished wire story); *Waskow* v. *Associated Press*, 462 F.2d 1173, 1176 (D.C. Cir. 1972) (same); *Gay* v. *Williams*, 486 F. Supp. 12, 16 (D. Alaska 1979) (same); *Zetes* v. *Richman*, 86 A.D.2d 746, 747 (N.Y. 1982) (gross irresponsibility not shown where newspaper merely republished wire story); *Washington Post Co.* v. *Keogh*, 365 F.2d 965, 972 (D.C. Cir. 1966) (malice not shown where newspaper merely republished syndicated column).

As noted, both AP and UPI are recognized throughout the newspaper industry as accurate sources of information. Because of this, each of the defendant newspapers stated, in an uncontroverted affidavit, that it customarily republishes wire service stories without independent corroboration of the information they contain. In fact, the newspapers stated that, given their resources and personnel, independent corroboration would ordinarily be impractical. We note that an examination of cases from other jurisdictions suggests that such reliance on the accuracy of the wire services is common throughout the industry. See, e.g., *Mehau* v. *Gannett Pac. Corp., supra; Zetes* v. *Richman, supra; Torres-Silva* v. *El Mundo, supra; Waskow* v. *Associated Press, supra; Gay* v. *Williams, supra.*

We think that the inference is inescapable that requiring verification of wire service stories prior to publication would impose a heavy burden on the media's ability to disseminate newsworthy material. "No newspaper could . . . assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies," *Layne* v. *Tribune Co.*, 108 Fla. 177, 188 (1933), while at the same

time publishing timely stories of worldwide or national interest. Because verification would be time-consuming and expensive, imposing such a burden would probably force smaller publishers to confine themselves to stories about purely local events. See *Mehau* v. *Gannett Pac. Corp., supra* at 149-150; *Washington Post Co.* v. *Keogh, supra; Gay* v. *Williams, supra* at 16-17. This, in turn, could make it extremely difficult for the smaller newspapers to compete with those publishers who "can afford to verify or to litigate." *Washington Post Co.* v. *Keogh, supra.* Moreover, aside from those burdens on the press which a duty of verification would impose, we recognize that society has an interest, embodied in the First Amendment, in avoiding "apprehensive self-censorship" by the news media. *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 860 (1975). *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 340 (1974). In light of all these factors, we conclude that a newspaper ordinarily has exercised "[d]ue care in gathering information," *Schrottman* v. *Barnicle,* 386 Mass. 627, 642 (1982), when it publishes material taken from a reputable wire service.

Appleby concedes that the imposition of a duty of verification would be generally improper in circumstances where the news originates from some remote source. Nonetheless, he argues that it would have been easy for the defendants to verify the accuracy of the wire service stories on the search of Appleby's home, since all four newspapers are located fairly close to West Springfield. Appleby contends that, whenever independent investigation is feasible, a newspaper acts negligently when it fails to verify the accuracy of a wire service story.

We disagree, and conclude that it would impose an impermissible burden on the dissemination of news if the media, and the courts, were forced to make subtle distinctions between verifiable and nonverifiable wire service stories. Certainly, many stories which originate locally would be prohibitively time-consuming or expensive to verify, while others which concern remote events could be corroborated by the simple act of placing a long distance telephone call. A publisher could only rarely be completely assured that his assessment of nonverifiability would stand up at trial. Thus, requiring newspapers

to distinguish between verifiable and nonverifiable reports would impose the same risks of "apprehensive self-censorship," *Stone* v. *Essex County Newspapers, Inc., supra,* as would the requirement that newspapers corroborate all wire service stories before publication.

We stress that this is not a case where the wire service stories are so inherently improbable or inconsistent that the defendants had, or should have had, some reason to doubt their accuracy. Nor is this a case where the plaintiff has shown that the defendants knew, or should have known, of certain facts extraneous to the wire service stories which would have raised doubts as to the stories' veracity. In such cases, republication without independent verification might well raise a triable issue of negligence, and the ease with which the information could have been verified may well be relevant. The fact that serious crimes were alleged in the stories at issue here is not in itself significant. Though sometimes sensational, wire service stories involving murder investigations are regrettably all too common to impose upon a newspaper the duty of independently verifying each one of them.

From the foregoing its is plain that, of the approximately forty-eight articles published about Appleby by the defendants between June 14, 1978, and May 20, 1981, summary judgment was appropriate with respect to those forty-four of the articles which are verbatim republications of wire service dispatches. However, two of the defendants also wrote a total of four staff articles about Appleby, which allegedly include certain false and defamatory statements. Each of the statements from the staff articles about which Appleby complains, and which are identified in his response to the defendants' interrogatories, restates material taken from the wire service stories. We conclude that, as far as a newspaper's negligence with respect to the truth of a statement is concerned, there is no difference between reprinting a wire service story verbatim, and accurately restating its contents. Thus, for the reasons set forth above, there is no triable issue of negligence with respect to those allegedly defamatory statements appearing in the defendants' staff articles.

All four staff articles contain statements about the search for bodies believed buried in Appleby's backyard. In fact, the first Boston Globe article cited reports that "Appleby had told police when he was arrested that he had buried a number of kidnap victims on his property."[7] All four articles also refer to allegations that Appleby had kidnapped a young man from New York. Finally, the articles all characterize Appleby's home as a "garage" or a "shack." Each of these allegedly defamatory statements is a fair account of material contained in the first AP and UPI stories released on June 14.[8] The June 16 staff article in the Daily Hampshire Gazette refers to Appleby as a "suspected homosexual torturer and alleged murderer," and states that he "may also have been a Nazi admirer." These statements are fair summaries of material contained in prior or contemporaneous AP stories, also published in the Daily Hampshire Gazette. These stories referred to: (1) police suspicions that Appleby "lur[ed] young homosexuals . . . to torture sessions"; (2) the "painstaking search for bodies" conducted by police; and (3) reports that Appleby "claims he heads an international Nazi organization." Accordingly, there is no triable issue of negligence with respect to the defendants' failure to verify independently these statements.[9]

We do not here depart from the principle that "there is no constitutional value in false statements of fact." *Gertz* v. *Robert*

---

[7] The same article acknowledged that "West Springfield police . . . discounted such reports and said that as far as they knew Appleby refused to talk to police at the time of his arrest."

[8] For example, an AP story published on June 14 cited reports that "Appleby told police he buried several bodies of kidnap victims in a fenced lot behind his home." The story also describes Appleby's arrest for kidnapping an individual in New York City, and it refers to Appleby's house as a "small hut with tarpaper-covered sides and a metal roof." A UPI story released on June 14 also cited reports that Appleby "said he had buried the bodies of several victims" in his yard. It noted his arrest for kidnapping, and described his house as a "garage-sized tar paper home."

[9] In light of our conclusion with respect to the negligence issue, we need not reach the defendants' contentions that the articles are fair reports of the contents of an affidavit in support of a search warrant, see *Sibley* v. *Holyoke Transcript-Telegram Publishing Co.*, 391 Mass. 468, 471 (1984), or that the articles are substantially true.

*Welch, Inc., supra* at 340. We merely hold that a newspaper is generally not negligent when it relies on the accuracy of stories received from a reputable wire service. Appleby's claims against the wire services are evidently still pending, and nothing in this opinion should be taken to affect the merits of those actions.

*Judgments affirmed.*