NATHAN FRIEDMAN & another[1] vs. BOSTON
BROADCASTERS, INC.

Suffolk. November 3, 1987. — May 16, 1988.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Libel and Slander. Collateral Estoppel. Practice, Civil,* Summary judgment.

A jury's verdict for the plaintiffs in one defamation action against a broad-
casting corporation, arising out of nonbroadcast statements by the defend-
ant's employee during a journalistic investigation of alleged insurance
fraud, did not entitle the plaintiffs to summary judgment on collateral
estoppel principles in a subsequent action against the same defendant
based upon statements contained in a television broadcast, since the
earlier statements had amounted to a virtual accusation of fraud, whereas
the broadcast statements were far more guarded, and thus presented a
different issue from that decided by the jury in the earlier proceeding.
[378-379]

In an action by plaintiffs claiming they had been defamed in a television
broadcast describing alleged abuses in the insurance industry, a matter
of public concern within the rule of *Philadelphia Newspapers, Inc.* v.
*Hepps,* 475 U.S. 767, 777 (1986), the defendant broadcasting corpora-
tion was entitled to summary judgment on so much of the plaintiffs'
claim as related to a group of four statements of fact, where the truth
of the individual statements was not disputed and where the statements,
taken together, were not reasonably susceptible of being interpreted as
falsely accusing the plaintiffs of fraudulently retaining for themselves
premiums paid for nonexistent insurance. [379-381]

In a defamation action by plaintiffs claiming they had been defamed in a tele-
vision broadcast describing alleged abuses in the insurance industry, the
defendant broadcasting company was not entitled to summary judgment
on so much of the plaintiffs' claim as related to certain statements which
were susceptible of the connotation that the plaintiffs had fraudulently
added to the premium charges for policyholders' automobile insurance,
where the materials before the judge revealed genuine factual issues as
to whether the statements were false and negligently made. [381-382]

CIVIL ACTION commenced in the Superior Court Department
on April 23, 1981.

---

[1] Allston Finance Co., Inc.

The case was heard by *Andrew G. Meyer*, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Owen Gallagher* for the plaintiffs.

*Paul W. Johnson* for the defendant.

O'CONNOR, J. This action concerns an August 23, 1978, television broadcast by the defendant, Boston Broadcasters, Inc. (BBI), the operator of WCVB-TV Channel 5 in Boston, concerning alleged abuses in the insurance industry. The plaintiffs claim to have been defamed by that broadcast, which was the third segment of a three-part series. The plaintiffs and BBI each filed a motion for summary judgment. A judge denied the plaintiffs' motion, and allowed BBI's. We affirm the denial of the plaintiffs' motion, but we reverse the allowance of BBI's motion and remand for trial on the question whether BBI falsely and negligently defamed the plaintiffs by broadcasting that they had secretly overcharged customers.

The parties agree that the oral statements made in the course of the broadcast were the same or substantially the same as those set forth in Appendix A to this opinion. The broadcast stated, in material part, the following: "The News Center Five Investigative Unit disclos[ed] this week that phony insura[nce] companies have been operating in Massachusetts[.] The companies — chartered in foreign countries — have be[en] selling worthless policies. Insurance fraud, however, [is] not limited to foreign companies. Tonight — in the final repo[rt] of a series — John Camp outlines other types of schemes. . . . Rockland [Mutual Insurance Company] is a[n or]iginator of a scheme called roll-ons. Roll-ons are secret charges tacked onto insurance premiums."

After discussing asserted "roll-ons" and "overcharges" by other companies, the broadcast continued: "Most of the overcharges are for automobile club memberships that customers didn't ask for — and in many instances — didn't know about[.] There are other types of roll-ons. Allston Finance Company specializes in financing auto insurance premiums. Onto most of its contracts — Allston adds a dollar or so for credit life insur-

ance — a policy guaranteeing that if you die — your auto insurance will be paid. State banking department records provide some startling statistics about Allston Finance. Since 1974 — the company has sold nearly 64-thousand credit life policies. Yet — according to the records — Allston has never paid a single claim. Nathan Friedman — who with hi[s] brother — owns Allston Finance — disputes the banking department records which he signed under penalties of perjury. Friedman said some claims had been paid. He promised last week to provide names — but to date — has not done so[.]

"There is another curious aspect to the Allston credit life policies. The company states in its 19[76] annual report that the polic[ies] are placed with Resolute Insurance Company. Resolute went out of business in 19[74] when it was bought by another company — and a spokesman for that company says he has never heard of Allston Finance Company. Nathan Friedman maintains that he paid premiums to an agent representing Resolute. He told Michal Regunberg of our staff that he doesn't know if the agent forwarded the money to [R]esolute."

The broadcast continued with a statement attributed to the head of the Massachusetts Division of Insurance that "unscrupulous operators are almost fearless because they haven't been prosecuted in the past." It closed with the statement that "[f]or the las[t] three nights — News Center Five has focuse[d] on some of the more blatant and dramatic schemes being employed to rip[ ]-off Massachusetts policyholders[.] Millions are pocketed each year by insurance crooks — even though they only make up a small percentage of the state's insurance people. . . . There is an encouraging word. That is that both State and Federal agencies are assigning a higher priority to finding solutions — and launching campaigns to shutdown the illegal operations."

Before commencing the present action, the plaintiffs had brought another action for defamation against BBI. That action also arose out of BBI's investigation of alleged insurance fraud. The evidence focused on an alleged statement made by a BBI employee on August 11, 1978, on the premises of Allston

Finance Company in the presence of Allston's employees. The challenged statement was that the BBI employee had information that the plaintiff, Friedman, "was writing insurance with an insurance company that was not in existence, and that [he] had collected the premiums and never paid them to any insurance company." The plaintiffs received a favorable verdict from the jury in that case.

Armed with that verdict, the plaintiffs moved in the present case for summary judgment grounded on collateral estoppel principles. The judge rightly denied the motion. Although the statements made at the plaintiffs' place of business on August 11 and those made in the course of the television broadcast on August 23 related to the same subject, the statements were different on their face. The first statement was virtually a direct accusation that Friedman had written insurance with a nonexistent insurer and had pocketed the premiums. The broadcast statements, however, while suggesting the nonexistence of an insurer and the plaintiffs' retention of the premiums as warrantable inferences from public records and other evidence, were far more guarded. Therefore, the issue decided by the jury in the earlier case was not the same as the issue presented by this case, and collateral estoppel, which requires identity of issues, does not apply. See *Massachusetts Property Ins. Underwriting Ass'n* v. *Norrington*, 395 Mass. 751, 753 (1985).

We turn now to the judge's order of summary judgment for BBI. Statements of opinion are constitutionally protected and thus are not actionable. *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987), cert. denied,      U.S.     ,      (1988) (108 S. Ct. 1121, 1227 [1988]). "[T]he determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion." *Id.* at 709, quoting *Aldoupolis* v. *Globe Newspaper Co.*, 398 Mass. 731, 733 (1986). Therefore, a defendant in a defamation action is entitled to summary judgment with respect to challenged statements that reasonably cannot be construed as statements of fact.

Even if the broadcast reasonably could have been understood as charging the plaintiffs with being "insurance crooks," engaged in "insurance fraud" and "blatant and dramatic schemes

. . . to rip[ ]-off Massachusetts policyholders," such conclusory statements, in the context of this case, must be viewed as statements of opinion and not of fact. While it is true that a "statement cast in the form of an opinion may imply the existence of undisclosed defamatory facts on which the opinion purports to be based, and thus may be actionable," *King, supra* at 713, there was no suggestion in this case that the quoted conclusions were arrived at on the basis of undisclosed facts. On the contrary, the broadcast set forth the facts on which the conclusions purported to be based. We must look, then, at those statements of fact to determine whether any of them are actionable.

For convenience of discussion, the broadcast statements of fact, set forth above, may be separated into two groups. The first group is comprised of statements bearing on "roll-ons." Roll-ons are described as a type of fraudulent scheme in which secret charges are tacked onto insurance premiums. Allston Finance Company was said to have specialized in financing automobile insurance premiums, and to have engaged in the practice of adding "a dollar or so" for credit life insurance. It is clear from the context that that practice was presented as an illustration or example of a roll-on.

The other group of statements is made up of several related assertions: (1) Public records revealed the "startling statistics" that Allston Finance Company had sold nearly 64,000 credit life insurance policies without ever having paid a claim; (2) Friedman, who was an owner of the company, had promised to identify claims that had been paid but had not done so; (3) "another curious aspect" to the credit life insurance policies was that, in its annual report for 1976, Allston said that the policies were placed with Resolute Insurance Company, but Resolute had gone out of business in 1974, having been bought by another company, and a spokesman for the successor insurer stated that he had never heard of Allston; and (4) Friedman maintained that he had paid the insurance premiums to Resolute's agent, but he did not know whether the agent had forwarded the premiums to Resolute.

The second group of statements, viewed alone or in the context of the entire broadcast, cannot be the basis of liability. These were statements about a matter of public concern, and therefore, even though they are statements of fact rather than of opinion, in order for them to be the basis of a recovery from this media defendant, the plaintiffs must prove not only that the statements were defamatory but also that they were false. *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 777 (1986). The motion judge properly concluded, on the basis of the materials submitted to him, that the statements in the second group were not false. Indeed, the plaintiffs do not contend that any of the individual statements were false, but rather that, altogether, the statements constituted a false accusation that the plaintiffs had kept for themselves premiums paid for nonexistent insurance. However, the statements are not reasonably susceptible of such an interpretation, particularly in light of BBI's repetition of Friedman's explanation. Surely, the statements suggest that further investigation might be appropriate, but such a suggestion is no more than an expression of opinion and is not actionable.

The first group of factual statements, those addressed to "roll-ons," presents a different picture. Those statements are susceptible of the connotation that the plaintiffs secretly, and therefore, fraudulently, added to automobile policyholders' premiums, premiums for credit life insurance. A jury would be warranted in finding that such a disclosure would discredit the plaintiffs in the minds of a considerable and respectable class of the community to the financial detriment of the plaintiffs. Thus, BBI was not entitled to summary judgment on the ground that the statements were nondefamatory beyond substantial question. See *King* v. *Globe Newspaper Co.*, *supra* at 717-718; *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975).

Furthermore, although the plaintiffs have the burden of proving that the statements were false, *Philadelphia Newspapers, Inc.* v. *Hepps*, *supra*, and that their publication was negligent, *Jones* v. *Taibbi*, 400 Mass. 786, 799 (1987), *Stone* v. *Essex County Newspapers, Inc.*, *supra* at 858, the materials provided

to the judge in conjunction with the summary judgment motions do not establish in BBI's favor that there is no substantial question as to those matters. Rather, the judge had before him Allston Finance Company's answer to BBI's interrogatories, which recited, among other things, the following: "Had the Defendant, its agents or representatives examined Allston Finance premium finance notes and investigated the matter thoroughly, they would have seen that Allston Finance's premium finance notes state in a separate area, 'the purchase of Credit Life Insurance coverage is voluntary and not required for credit.' Directly underneath this statement are two places for the customer's signature, one is designated 'I desire Credit Life Insurance Coverage,' the other states, 'I do not desire Credit Life Insurance Coverage.'" The answer to the interrogatories also stated: "Any person desiring to purchase credit life insurance had to sign his/her name in the appropriate place [on the premium finance note]." Thus, we agree with the plaintiffs that they may be able to show that the roll-on statements were not only defamatory, but that they were false and negligently made as well, and were therefore actionable.

We affirm the judge's denial of the plaintiffs' motion for summary judgment. We reverse the summary judgment for the defendant, and remand to the Superior Court for further proceedings not inconsistent with this opinion.

*So ordered.*

APPENDIX A.

"THE NEWS CENTER FIVE INVESTIGATIVE UNIT DISCLOS[ED] THIS WEEK THAT PHONY INSURA[NCE] COMPANIES HAVE BEEN OPERATING IN MASSACHUSETTS[.] THE COMPANIES — CHARTERED [IN] FOREIGN COUNTRIES — HAVE BE[EN] SELLING WORTHLESS POLICIES[.] INSURANCE FRAUD, HOWEVER, [IS] NOT LIMITED TO FOREIGN COMPANIES.

"TONIGHT — IN THE FINAL REPO[RT] OF A SERIES — JOHN CAMP OUTLINES OTHER TYPES OF SCHEMES. . . .

"This is an unlikely looking school — but in the early 1970's — a lot of insurance agents got an education here. The subject — insurance rip-offs.

"The teacher — Rockland Mutual Insurance Company which was forced into receivership in 1974 because of mismanagement. To pay Rockland's debts — one-dollar is added to the cost of every auto insurance policy sold in Massachusetts. But Rockland's greatest impact goes beyond that one-dollar because of some of the lessons it taught its students.

"Rockland is a[n or]iginator of a scheme called roll-ons. Roll-ons are secret charges tacked onto insurance premiums. And many of Rockland's graduates have been doing graduate work in roll-ons. Our investigation has found at least a half-dozen large insurance agencies with past ties to Rockland are being investigated for overcharges. Former Rockland employe[e] John C. Roche has been forced to refund his customers nearly a half-million dollars.

"The Brookfield Agency of Quincy — a former Rockland broker — last year repaid 250 thousand dollars in overcharges to its customers.

"Most of the overcharges are for automobile club memberships that customers didn't ask for — and in many instances — didn't know about[.] There are other types of roll-ons.

"Allston Finance Company specializes in financing auto insurance premiums.

"Onto most of its contracts — Allston adds a dollar or so for credit life insurance — a policy guaranteeing that if you die your auto insurance will be paid.

"State banking department records provide some startling statistics about Allston Finance.

"Since 1974 — the company has sold nearly 64-thousand credit life policies.

"Yet — according to the records — Allston has never paid a single claim. Nathan Friedman — who with hi[s] brother — owns Allston Finance — disputes the banking department records which he signed under penalties of perjury. Friedman said some claims had been paid. He promised last week to provide names — but to date — has not done so[.]

"There is another curious aspect to the Allston credit life policies.

"The company states in its 19[76] annual report that the polic[ies] are placed with Resolute Insurance Company.

"Resolute went out of business in 19[74] when it was bought by another company — and a spokesman for that company says he has never heard of Allston Finance Company. Nathan Friedman maintains that he paid premiums to an agent representing Resolute.

"He told Michal Regunberg of our staff that he doesn't know if the agent forwarded the money to [R]esolute.

"The Massachustts Insurance Division — headed by James Stone — has been working wit[h] other state agencies in recent months in an effort to clean up Massachusetts' insurance industry.

"Stone says, however, that unscrupulous operators are almost fearless because they haven't been prosecuted in the past.

"FOR THE LAST THREE NIGHTS — NEWS CENTER FIVE HAS FOCUSE[D] ON SOME OF THE MORE BLATANT AND DRAMATIC SCHEMES BEING EMPLOYED TO RIPP[ ]-OFF MASSACHUSETTS POLICYHOLDERS[.] MILLIONS ARE POCKETED EACH YEAR BY INSURANCE CROOKS — EVEN THOUGH THEY ONLY MAKE UP A SMALL PERCENTAGE OF THE STATE'S INSURANCE PEOPLE.

"THE PROBLEM, HOWEVER, GOES DEEP — AND POLICYHOLD-ERS AR[E] PAYING FOR THE LOSSES IN INCREASED PREMIUMS.

"THERE IS AN ENCOURAGING WORD. THAT IS THAT BOTH STATE AND FEDERAL AGENCIES ARE ASSIGNING A HIGHER PRIORITY TO FINDING SOLUTIONS — AND LAUNCHING CAM-PAIGNS TO SHUTDOWN THE ILLEGAL OPERATIONS.

"I'M JOHN CAMP OF THE NEWS CENTER FIVE INVESTIGATIVE UNIT."