James F. Howell *vs.* The Enterprise Publishing Company, LLC, & others.[1]

No. 07-P-1603.

Plymouth. May 19, 2008. - October 1, 2008.

Present: Katzmann, Meade, & Sikora, JJ.

Further appellate review granted, 452 Mass. 1109 (2008).

*Appeals Court,* Appeal from order of single justice. *Constitutional Law,* Privacy, Libel and slander. *Privacy. Libel and Slander. Emotional Distress.*

Discussion of the standard of review applicable to a grant of summary judgment. [741-742]

Discussion of the elements of the tort of defamation. [742-743]

In a civil action alleging, inter alia, that the defendant newspaper publisher defamed the plaintiff when it printed articles concerning his termination from his employment as the superintendent of a town's sewer department, the judge properly denied the defendant's motion for summary judgment, where each of the alleged defamatory statements concerning the plaintiff's conduct and associations in the context of his municipal employment presented genuine issues of material fact as to their veracity [743-748], and the fair report privilege did not require a different result in light of material factual issues in dispute regarding whether the articles were fair and accurate [748-749].

A Superior Court judge erred in denying the defendant newspaper publisher's motion for summary judgment on the plaintiff's claim that the defendant invaded his privacy by publishing articles reporting allegations of misconduct against the plaintiff in the performance of his public duties as superintendent of a town's sewer department, where the factual accounting of matters of legitimate public interest was not actionable under G. L. c. 214, § 1B, and reasonable minds would agree on the newsworthiness of the story [749-751]; further, the reports were not based on unconfirmed rumors [751] or protected from public disclosure by the provisions of the open meeting law, where members of the press, or other private citizens, were free to report on matters of public concern raised during executive sessions held by the commission for which the plaintiff worked [751-752]; finally, there was no merit to the plaintiff's claim of invasion of privacy based on the defendant's reporting of the plaintiff's collection of unemployment benefits [752-753].

In a civil action arising from the defendant newspaper company's publication of articles concerning allegations of the plaintiff's misconduct as a public employee, the judge did not err in denying the defendant's motion for

---

[1]Elaine Allegrini and Allan Stein.

summary judgment on the plaintiff's claim of intentional infliction of emotional distress, where there were disputed issues of fact concerning the defendant's knowledge and intent in publishing the articles, and where that claim was not duplicative of the plaintiff's claim of defamation. [753]


CIVIL ACTION commenced in the Superior Court Department on December 27, 2005.

The case was heard by *Frances A. McIntyre*, J., on a motion for summary judgment.

An application for leave to prosecute an interlocutory appeal was allowed in the Appeals Court by *Barbara A. Lenk*, J.

*Jonathan M. Albano* (*Laura K. Langley* with him) for the defendants.

*John G. H. Coster* for the plaintiff.

MEADE, J. The defendants, The Enterprise Publishing Company, LLC, and reporters Elaine Allegrini and Allan Stein (collectively, Enterprise), obtained leave from a single justice of this court, see G. L. c. 231, § 118, to pursue this interlocutory appeal. Enterprise claims error in the denial of its motion for summary judgment as to plaintiff James F. Howell's defamation, invasion of privacy, and intentional infliction of emotional distress claims. We affirm in part and reverse in part.

1. *Background.* The genesis of this matter occurred with Enterprise's publication of eleven newspaper accounts reporting on Howell's termination from his employment as the superintendent of the sewer department of the town of Abington (town). Howell's termination followed an investigation by the town and a closed hearing before the Abington sewer commission (commission) regarding his alleged improper use of town computers. The commission determined that Howell had used town computers for personal business, including storing business records for his private radiator company and inappropriate images, as well as sending inappropriate electronic mail messages (e-mail) to a subordinate. The commission did not sustain a conflict of interest allegation.

Howell appealed the termination to the board of selectmen (board) of Abington. The board held a public hearing on the matter, which was locally televised. At the conclusion of the hearing,

the board upheld the commission's decision to terminate Howell. Howell filed suit, which is detailed *infra*.

2. *Defamation claims.* Howell alleges that Enterprise defamed him by (1) accusing him of storing pornography on his town-owned computers; (2) associating his conduct with that of one Frank Savino without adequately differentiating between the materials kept by each man, thereby insinuating that Howell had child pornography (and other hard-core pornographic materials) on his computers; (3) inaccurately reporting that a conflict of interest charge against him had been sustained and upheld; (4) implying that he had sexually harassed a female subordinate; (5) implying that he was fraudulently collecting unemployment benefits; and (6) implying that he spent the majority of his time at work downloading pornography and working on personal business. Enterprise moved for summary judgment as to the defamation claim, arguing generally that the information published was substantially true as well as protected by the so-called "fair report privilege." The judge denied Enterprise's motion, concluding that issues of material fact regarding whether the articles were fair and accurate made summary judgment inappropriate. Enterprise appeals and we address each alleged defamatory statement separately.

A. *Standard of review.* "The purpose of summary judgment is to decide cases where there are no issues of material fact without the needless expense and delay of a trial followed by a directed verdict." *Correllas* v. *Viveiros*, 410 Mass. 314, 316 (1991). To that end, summary judgment is appropriate only "where there is no genuine issue of material fact, and when, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Gray* v. *Giroux*, 49 Mass. App. Ct. 436, 438 (2000). See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in [rule] 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). Our review is de novo, see

*Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997); we consider the record and the legal principles involved without deference to the judge's reasoning. See *Clean Harbors, Inc.* v. *John Hancock Life Ins. Co.*, 64 Mass. App. Ct. 347, 357 n.9 (2005).

B. *Elements of defamation.* Defamation is the intentional or negligent[2] publication to a third person, without privilege to do so, of a false statement of fact that "discredits the plaintiff 'in the minds of any considerable and respectable segment in the community.' " *Draghetti* v. *Chmielewski*, 416 Mass. 808, 811 (1994), quoting from *Tropeano* v. *Atlantic Monthly Co.*, 379 Mass. 745, 751 (1980). See *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 630 (2003), quoting from Restatement (Second) of Torts § 559 (1977) ("A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him"). The allegedly defamatory statement need not be an explicit assertion. "An insinuation may be as actionable as a direct statement." *Mabardi* v. *Boston Herald-Traveler Corp.*, 347 Mass. 411, 413 (1964), quoting from *Thayer* v. *Worcester Post Co.*, 284 Mass. 160, 162 (1933). "The existence of defamatory innuendo is a question of fact for a jury to consider." *Reilly* v. *Associated Press*, 59 Mass. App. Ct. 764, 774 (2003).

To be actionable, the allegedly defamatory utterance must be false. *Milgroom* v. *News Group Boston, Inc.*, 412 Mass. 9, 12 (1992). However, a factual statement need not state the precise truth. *Reilly, supra* at 770. "[W]hen a statement is substantially true, a minor inaccuracy will not support a defamation claim." *Ibid.* See *Murphy* v. *Boston Herald, Inc.*, 449 Mass. 42, 51 n.10 (2007). "[A]n objective test — i.e., inquiry into a reasonable

_____

[2]In its motion for summary judgment, Enterprise made no argument that Howell is a public figure or a public official such as would require him to show "actual malice," i.e., that "the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). Thus, for purposes of our analysis, we assume without deciding that Howell is a private individual who may recover if Enterprise was negligent in ascertaining the truth or falsity of the material published. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 858 (1975).

recipient's understanding of the words rather than the speaker's intent — has been used over the years to prove that words are defamatory." *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 479-480 (1985). "A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it." *Id.* at 480, quoting from *Washington Post Co.* v. *Chaloner*, 250 U.S. 290, 293 (1919). Where a communication "is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury." *Draghetti* v. *Chmielewski, supra.* See *Jones* v. *Taibbi*, 400 Mass. 786, 792 (1987). In determining whether a communication is defamatory, it must be examined as a whole. See *Foley* v. *Lowell Sun Publishing Co.*, 404 Mass. 9, 11 (1989). Although a plaintiff may not "lift" a portion of the publication out of context, "a defendant who publishes a defamatory headline is not immune simply because the text of the article is harmless." Nolan & Sartorio, Tort Law § 7.2, at 172 (3d ed. 2005).

C. *The alleged defamatory statements.* i. *Pornographic materials.* In numerous places throughout the eleven articles written about Howell and published between May 11 and November 29, 2005, Enterprise reported that pornographic materials were found on Howell's town-owned computers. Such references included articles entitled "Officials find porn on town computer," "Abington official fired over computer porn," and "Porn at town hall," as well as passages stating that the images included "nude and scantily clad women and other sexually suggestive subjects," and "[t]he images included . . . nude and scantily clad women . . . and other material of a sexual nature." Howell disputes the assertions that the pictures found on his computers were pornographic. He argues that none of the images depict sex acts, show full or frontal nudity, or are intended to arouse one's sexual desire or appeal to the prurient interest. The ostensibly comical as opposed to sexual nature of the images, he claims, renders false Enterprise's repeated characterization of the materials as pornographic.[3] Enterprise responds that the articles are substantially true. We disagree.

---

[3]We are unaware of any legal definition of pornography as might apply in Massachusetts to sexually explicit images of adults. We note, however, that

Arguing that there was no material falsity in referring to the materials as pornographic, Enterprise notes that the commission sustained the charges accusing Howell of having images of a pornographic nature on his computers and that such ruling was upheld by the board. However, it is not of itself a defense that Enterprise's information sources may have described the images as pornographic. "Absent a privilege, 'the republisher of a defamatory statement "is subject to liability as if he had originally published it." ' Liability for a defamatory statement may not be avoided 'merely [by] adding a truthful preface that someone else has so stated.' " (Citations omitted). *Jones,* 400 Mass. at 792. See *Appleby* v. *Daily Hampshire Gazette,* 395 Mass. 32, 36 (1985). Here, there is a genuine issue of material fact whether the images found on Howell's computers were pornographic as the word is commonly understood. A jury should be allowed to consider whether Enterprise's articles on that point were false. See *Friedman* v. *Boston Broadcasters, Inc.,* 402 Mass. 376, 381-382 (1988).

ii. *Association with Savino.* In seven of the articles written about Howell, Enterprise made references to Savino, a former town official in East Bridgewater who was found to possess child pornography and other hard-core pornographic materials on his work computers. Included among those articles is an August 27, 2005, editorial by Steve Damish, which repeatedly refers to the

the statute criminalizing the purchase or possession of materials commonly referred to as child pornography requires more than mere nudity. See G. L. c. 272, § 29C, inserted by St. 1997, c. 181, § 2, (prohibited materials include depictions in which the child is "engaged in any act of" sexual intercourse, sexual contact involving the sex organs, masturbation, excretion or urination within a sexual context, lewd fondling, touching, or caressing; portrayed as bound or fettered within a sexual context; or depicted in any pose, posture, or setting involving a lewd exhibition of the unclothed genitals, pubic area, buttocks, or female breast). See also *Commonwealth* v. *Bean,* 435 Mass. 708, 711 (2002) (key element of the child pornography statute is that the posing of the child is done with "lascivious intent"). Additionally, we note that a common dictionary defines pornography as a depiction of "licentiousness or lewdness: a portrayal of erotic behavior designed to cause sexual excitement." Webster's Third New Intl. Dictionary 1767 (1993). However, because Howell's claim is for defamation, the question is not whether the materials found on his computers were pornographic in some technical sense of the word, but rather whether the materials were consistent with the common understanding of pornography among those to whom the articles were addressed. See *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.,* 395 Mass. at 480.

two men as a uniform subject and speaks of "their Internet garbage," "their quirky cravings," and "their depravity." Howell claims that by so associating the two men and characterizing the circumstances that led to their respective dismissals as "similar," Enterprise insinuated that he had child pornography (and other hard-core pornographic materials) on his computers. Enterprise counters that the articles are not reasonably capable of such a meaning.

However, as the motion judge properly determined, the repeated associating, equating, and intermixing of Howell's conduct with that of Savino could cause a reader to be unable to determine which images Howell possessed, and believe that he had child pornography and other hard-core pornographic materials on his computers. Particularly capable of generating such confusion is the Damish editorial, which included the following: "A new day has dawned, with dogs like Howell and Savino dragging their Internet garbage into public buildings, making a mess of once-revered places and a mockery of once-respected institutions. . . . Now [selectmen] have to stare at a topless Miss Piggy, or women and men having sex, or a naked toddler grabbing her genitals, or a man lifting a barbell with his private parts, or a person with a cigarette in his behind. Howell and Savino had hundreds of these images on their computers. . . . These two men could have . . . quietly carried their quirky cravings away with them. But they wanted their day in town hall. That meant officials and anybody else unlucky enough to be there had to witness their depravity firsthand. . . . They sat and had to stare at the oddball interests of two former town workers who lack self control. Photo after photo. Hour after hour they had to sit, along with the accused, and digest this stew of foulness."

Damish's caveat that Savino "had the worst stuff — he had the images of people engaged in sexual acts" was inadequate to dispel the false impression that the images found on Howell's computers, which then are described as "visceral" and "disgusting," included child pornography and other hard-core pornographic materials. A reader reasonably could conclude from the editorial, coupled with the other articles, that although only Savino had images of people engaged in sexual acts, both men

possessed child pornography and other pornographic materials. See *Reilly*, 59 Mass. App. Ct. at 778 ("Once the court has determined that a statement is capable of a defamatory meaning, it is for a jury to decide whether the statement was so understood by its recipient").

iii. *Conflict of interest charge.* In an article published on September 26, 2005, Enterprise inaccurately reported that a conflict of interest charge had been sustained against Howell by the commission and upheld by the board. Enterprise concedes that although alleged against Howell, the conflict of interest charge was neither sustained nor upheld. Nonetheless, Enterprise contends that because three other charges against Howell were sustained, the "gist" or "sting" of the article would not have been different if the precise truth had been substituted for what was written. See *ELM Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 783 (1989), quoting from *Williams* v. *WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983). We disagree.

The article falsely implied that the commission formally had determined that Howell improperly had purchased items for his personal use through the sewer department's vendors in order to take advantage of the town's discount and tax exemptions. In fact, the commission did not sustain that charge. This inaccuracy was not merely a question of degree as suggested by Enterprise but, rather, was one pertaining to the occurrence of the underlying event. Contrast *Weisburgh* v. *Mahady*, 147 Vt. 70, 71, 73 (1986) (report that the plaintiff had been charged with receiving approximately $50,000 in stolen goods was substantially true, where the actual charge was for receipt of $505 in stolen goods). It matters not that three other factually distinct charges against Howell were sustained. Those charges involved different conduct and distinct legal ramifications.

iv. *Sexual harassment.* In an article published on August 3, 2005, Enterprise reported that Howell was "accused of distributing 'objectionable' material by e-mail to a female subordinate" and that "[t]he potential is still very real for a sexual harassment lawsuit." Howell alleges that this article and another, published on August 24, 2005, erroneously implied that he had sexually harassed a female subordinate by sending her "attachments containing pornography" and "images [that] included

nude women in various poses and other sexual material." Howell claims that this was defamatory because, as indicated by the subordinate's testimony before the board, the images he sent to her were not of nude women, contained no frontal nudity of any kind, and were comical as opposed to sexual in nature.[4] A rational reader could believe from the articles, however, that Howell had sent pornographic materials to the subordinate, and an issue of material fact is presented as to whether Enterprise was negligent in ascertaining the truth or falsity of that assertion.

v. *Receipt of unemployment benefits.* In an article published on November 29, 2005, Enterprise reported that following Howell's termination for violating the town's computer use policy, he was collecting unemployment benefits and "meanwhile operate[d] Blue Hill Radiator, a private business he had while serving as sewer superintendent." Howell alleges that this article was defamatory as it unfairly insinuated that he was defrauding the Division of Unemployment Assistance by collecting unemployment benefits while working full time at Blue Hill Radiator. Although not clearly defamatory, these assertions are reasonably capable of the defamatory meaning ascribed to them by Howell. Whether there were defamatory innuendos underlying the passage, and whether Enterprise was negligent in ascertaining the truth or falsity of any such insinuation, are questions for a jury. *Reilly,* 59 Mass. App. Ct. at 774.

vi. *Neglect of professional duties.* Howell alleges that many of the articles written about him were defamatory as they falsely implied that he neglected his professional duties and instead spent the majority of his time at work downloading pornography and working on his personal business. In particular, he argues that Enterprise unfairly reported that 99.5 percent of the files on

---

[4]In response to the statement, "I'm going to ask you to identify all of these documents and tell me if these are the ones that Mr. Howell sent to you through your, I assume e-mail," the subordinate responded: "Yes. This was one e-mail. It's a picture of obese women in bikinis. A picture of a man laying on a bed undressed with [inaudible] drawn all over his backside. A picture of a man with a tampon in his mouth. A picture of someone's naked backside with paintings on it. A picture of a woman laying face down that appears to be passed out on a picnic table with no top on and a picture of a woman who appears to be passed out who appears to have urinated on herself. . . . And the last one was a picture of an obese woman who appears to be laying on a man in bed."

his laptop were not work related, while failing to report that Howell claimed he regularly saved his work-related files to zip drives, and that the images had been sent to him by friends as attachments to unsolicited e-mails that were intended to be comical. Because the articles are susceptible to the defamatory meaning suggested by Howell, an issue of material fact is presented as to whether Enterprise was negligent in ascertaining the truth or falsity of any such assertion. See *id.* at 779 ("Reilly's version of events, had it been included in the article, would have [refuted certain of the article's assertions]. . . . Thus, disputed issues of material fact emerge as to whether the [newspaper] negligently published the story without first calling a willing source to clarify certain statements or alerting readers that there were disputed facts").

In sum, each of the alleged defamatory statements presented a genuine issue of material fact. Thus, summary judgment properly was denied on Howell's defamation claim.

D. *The fair report privilege.* As it did in its motion for summary judgment, Enterprise argues generally that its articles are protected by the fair report privilege. This privilege "allows those who fairly and accurately report certain types of official or governmental action to be immune from liability for claims arising out of such reports." *ELM Lab., Inc.,* 403 Mass. at 782. This privilege is based upon the recognition that "(1) the public has a right to know of official government actions that affect the public interest, (2) the only practical way many citizens can learn of these actions is through a report by the news media, and (3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report was fair and accurate." *Ibid.* It protects the publication of "a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern." *Jones,* 400 Mass. at 794 n.11. It does not extend to "unofficial talk of . . . officials . . . , as distinct from their official utterances or acts." *Id.* at 796.

Even assuming, but not deciding, that the fair report privilege is otherwise applicable to the matters reported on in the articles about Howell, its protection extends only to reports that are both fair and accurate. See *Whitcomb* v. *Hearst Corp.,* 329 Mass. 193,

200 (1952) ("If a newspaper does publish such reports, it must at its peril publish fairly and accurately"). In determining whether a report is fair and accurate, the test is whether a reporter's "rough-and-ready summary" of the matter reported on is "substantially correct." *MiGi, Inc.* v. *Gannett Mass. Broadcasters, Inc.*, 25 Mass. App. Ct. 394, 396 (1988). "A statement is considered a fair report 'if its "gist" or "sting" is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced.' " *ELM Lab., Inc., supra* at 783, quoting from *Williams* v. *WCAU-TV*, 555 F. Supp. at 202. Where there is a basis for divergent views, the question whether a report is fair and accurate is for the jury. *Joyce* v. *Globe Newspaper Co.*, 355 Mass. 492, 498-499 (1969). As discussed, *supra*, here there are material factual issues in dispute regarding whether the articles are fair and accurate. Thus, the judge correctly concluded that summary judgment is not appropriate as to Howell's defamation claims.

3. *Invasion of privacy claim.* The judge also denied Enterprise's motion for summary judgment as to Howell's invasion of privacy claim. Because we conclude that the articles concerned a matter of legitimate public interest, we reverse this portion of the order.

General Laws c. 214, § 1B, inserted by St. 1974, c. 193, § 1, provides in relevant part: "A person shall have a right against unreasonable, substantial or serious interference with his privacy." Section 1B has been interpreted to include the common-law tort of public disclosure of private facts. See *Bratt* v. *International Bus. Machs. Corp.*, 392 Mass. 508, 519 n.15 (1984). This statutory right is circumscribed by the constitutionally protected right of others to publish matters of legitimate public concern. See *Jones, supra* at 801 ("the public has a right to be informed about matters in which it has a legitimate concern"); *Boston Herald, Inc.* v. *Sharpe*, 432 Mass. 593, 612 (2000) ("When the subject matter . . . is of legitimate public concern, . . . there is no invasion of privacy"). Thus, in order to be an actionable invasion of privacy, the facts disclosed about a person must be of no legitimate public concern. See, e.g., *Peckham* v. *Boston Herald, Inc.*, 48 Mass. App. Ct. 282, 286-287 (1999) (disclosure of records in a confidential paternity suit not an invasion of privacy because of legitimate public interest in the

matter); *Reilly,* 59 Mass. App. Ct. at 769 (possible discipline of a State licensed veterinarian due to negligent care is a matter of legitimate public concern).

Matters included within the scope of legitimate public concern are those "of the kind customarily regarded as 'news.' . . . Authorized publicity includes publications concerning homicide and other crimes, arrests, police raids, suicides, marriages and divorces, accidents, fires, catastrophes of nature, a death from the use of narcotics, a rare disease, . . . and many other similar matters of genuine, even if more or less deplorable, popular appeal. . . . The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern." *Peckham* v. *Boston Herald, Inc., supra* at 287-288.

Here, the judge determined that it was a jury question whether the matters reported on were in the public interest. However, because reasonable minds would agree on the newsworthiness of the story, we hold that the judge erred in denying summary judgment on Howell's invasion of privacy claim. Whether a publication concerns a matter of legitimate public interest is a threshold issue of law for the court. *Id.* at 288-289 (question for the court as gatekeeper is whether a jury question is presented and whether "reasonable minds could differ as to how the community would regard the publication at issue"). The articles reported on allegations of misconduct leveled against a public employee in the performance of his public duties. The articles concerned the employee's past performance and his fitness for his public duties, as well as his possible continued employment and receipt of unemployment compensation following his termination. The story thus pertained to the execution and oversight of public employee performance, the effective administration of town operations, and potential fiscal obligations occasioned by the unemployment compensation program and the investigation and legal proceedings associated with Howell's termination. All of these are matters as to which members of the public, as residents and taxpayers, have a legitimate interest.[5] See, e.g.,

---

[5]We are not persuaded that Howell's termination from public employment

*George W. Prescott Publishing Co.* v. *Register of Probate for Norfolk County*, 395 Mass. 274, 279 (1985) (the public has a legitimate interest in whether public servants carry out their duties in an efficient and law-abiding manner); *Mulgrew* v. *Taunton*, 410 Mass. 631, 637 (1991) (because the public has an important interest in having a police force comprised of competent individuals, the disclosure of matters regarding the plaintiff's fitness to be a police officer was not an unreasonable interference with the plaintiff's privacy). Because the factual accounting of such matters of legitimate public interest is not actionable under G. L. c. 214, § 1B, the judge erred in denying Enterprise's motion for summary judgment as to Howell's invasion of privacy claim.

Our conclusion is unaffected by the fact that some of the articles attributed certain information, such as the possibility of a criminal investigation, to town officials speaking on condition of anonymity. Far from the "unsubstantiated and uncorroborated 'raw investigative materials' " discussed in *Haggerty* v. *Globe Newspaper Co.*, 383 Mass. 406, 407 (1981), here, the matters reported were based on direct information, including statements made by and attributed to the town manager, the chair of the commission, the police chief, and others. The articles were not, as Howell argues, based on unconfirmed rumors repeated by sources lacking firsthand knowledge of the information being conveyed.

Likewise, Howell's reliance on the open meeting law is misplaced. He claims the information reported on by Enterprise was protected from public disclosure because the hearing before the commission was held in executive session pursuant to G. L. c. 39, § 23B. We disagree. The open meeting law is addressed to the operation of governmental bodies; it does not regulate private conduct. Although the open meeting law generally requires governmental business to be conducted in public, in certain circumstances it permits government bodies to meet in executive session.

on August 3, 2005, stripped away the public's legitimate interest in these matters. Indeed, Howell's past performance of his public duties, the circumstances surrounding his termination, the town's handling of the matter, and the fiscal obligations associated with the incident all retained their significance as matters of legitimate public concern after Howell's termination from public employment.

That limited authorization for public officials to convene in the absence of direct public scrutiny, however, does not amount to a general prohibition against a private entity's disclosure of information. Nowhere in its provisions, nor in the case law interpreting those provisions, does the open meeting law prohibit members of the press, or other private citizens, from reporting on matters of public concern that are raised during executive sessions.

Nor do we agree with Howell that Enterprise invaded his privacy by reporting that he was collecting unemployment benefits. In support of this contention, Howell points to G. L. c. 151A, § 46(a), as appearing in St. 1990, c. 154, § 31, which provides that "information secured pursuant to [c. 151A] is confidential." The basic underlying fact of Howell's receipt of benefits, however, is not information secured pursuant to c. 151A, and does not fall within the ambit of that restriction. Likewise, G. L. c. 268B, § 4, discussing investigations by the State ethics commission, keeps confidential only the records and the proceedings from preliminary inquiries and initial staff reviews.[6] It does not extend to the more limited information disclosed by Enterprise, i.e., the existence of an investigation and the general nature of the alleged violation.

Howell's contention that his receipt of unemployment benefits was not a matter of legitimate public concern because such benefits are paid out of a general Statewide fund, fares no better. Although it is true that G. L. c. 151A establishes a Statewide unemployment compensation fund, employers such as the town cover the costs of unemployment benefits by making payroll tax contributions to that fund. See G. L. c. 151A, § 14 (establishing the method for calculation of payroll taxes); G. L. c. 151A, § 14A (establishing an alternative payment option for nonprofit organizations and governmental employers). Pursuant to G. L. c. 151A, § 14(c) and (d), an account for each employer subject to the statute is maintained in accordance with that employer's contributions and the charges against the account occasioned by the payment of benefits. See National Sch. Bus Serv., Inc. v.

---

[6]In relevant part, G. L. c. 268B, § 4(b), as appearing in St. 1986, c. 12, § 5, provides: "All commission records and proceedings from any such preliminary inquiry, or from any initial staff review to determine whether to initiate an inquiry, shall be confidential."

*Commissioner of the Dept. of Employment & Training*, 49 Mass. App. Ct. 445, 446 n.2 (2000). As such, Howell's receipt of unemployment benefits affected both the town's and the Commonwealth's fiscal obligations, and was therefore a matter of legitimate public concern.

4. *Intentional infliction of emotional distress claims.* Finally, we reject Enterprise's contention that summary judgment should have been granted as to Howell's intentional infliction of emotional distress claim because it is duplicative of his claims of defamation and invasion of privacy. One who, without privilege to do so, by extreme and outrageous conduct, intentionally causes severe emotional distress to another, is subject to liability for such emotional distress. *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976). Here, there are disputed issues of material fact concerning Enterprise's knowledge and intent. The volume of articles and the virulence in the publications recounted *supra* contribute to the creation of genuine issues of material fact of harmful intent and severe resulting distress.

Unlike in the authority cited by Enterprise, the allegedly defamatory statements that form the basis of Howell's intentional infliction of emotional distress claim were not made in circumstances rendering them absolutely privileged. Contrast *Correllas* v. *Viveiros*, 410 Mass. at 324 (absolute privilege from a claim of defamation for testimony given by a witness at a criminal trial "would be of little value if the individual were subject to liability under a different theory"); *Fisher* v. *Lint*, 69 Mass. App. Ct. 360, 370 (2007) (absolute privilege protected a witness's testimony at quasi judicial trial board proceedings without regard to the cause of action related to the same testimony). Even if the fair report privilege were applicable here, which we do not decide, that privilege is only conditional, not absolute.[7] Thus, the judge properly denied summary judgment as to Howell's intentional infliction of emotional distress claim.

5. *Conclusion.* So much of the order that denies summary judgment to Enterprise on Howell's invasion of privacy claim is

---

[7]Unlike the fair report privilege, an absolute privilege is a complete defense to a claim of defamation even where the allegedly defamatory statement is false and published with malice. Contrast *Mulgrew* v. *Taunton*, 410 Mass. at 634. See Nolan & Sartorio, Tort Law § 7.13, at 204 (3d ed. 2005).

reversed, and judgment shall enter for Enterprise on that claim. The remainder of the order denying summary judgment to Enterprise is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*