BRIAN R. DRISCOLL & others[1] *vs.* BOARD OF TRUSTEES OF
MILTON ACADEMY & another.[2]

No. 06-P-1796.

Norfolk. May 9, 2007. - September 27, 2007.

Present: PERRETTA, KAFKER, & MILLS, JJ.

*Negligence,* Standard of care, Duty to prevent harm, School. *Due Procees of
Law,* Private school. *Education,* Disciplinary matter. *Contract,* Performance
and breach, School handbook. *Libel and Slander. Practice, Civil,* Complaint.

A Superior Court judge properly dismissed a negligence claim against a
  private school brought by the plaintiffs, a seventeen year old student who
  was expelled by the school and charged criminally with statutory rape for
  conduct that occurred at the school, and his parents, where the student
  could not recover in tort against the school for his own sexual misconduct,
  even if the school were lax in monitoring its facilities and teenage sexual
  activity; where the school had no duty to advise the student to speak to his
  parents or a lawyer before questioning him and requiring him to prepare a
  written statement regarding his conduct; and where the school was not
  responsible in tort for the criminal consequences of the student's actions or
  the criminal investigation or prosecution that followed the school's internal
  review. [290-293] MILLS, J., dissenting.
Provisions of a private school's handbook, including its articulated disciplin-
  ary process, did not separately or collectively create any reasonable expecta-
  tions that were violated by the school in its handling of a student's sexual
  misconduct, nor did the school arbitrarily or capriciously dismiss the
  student or do so in bad faith; rather, the school acted because of the
  student's serious sexual misconduct involving a younger student, which he
  was given an opportunity to explain. [293-295]
In a civil action, there was no merit to the claim that the defendant, a private
  high school, made false and defamatory statements of and concerning the
  student plaintiff, where statements whether the student pressured or coerced
  another student into performing sexual acts at the school were clearly
  opinions based on disclosed nondefamatory facts [295-298]; likewise, there
  was no actionable defamation in a separate statement by the school that
  did not name the student plaintiff but that referenced previous incidents of
  sexual misconduct at the school [298-299].
A Superior Court judge properly concluded that the complaint in a civil action

[1]Tracy Driscoll and James B. Driscoll.
[2]Robin Robertson.

warranted dismissal for failure to comply with Mass.R.Civ.P. 8(a), regarding pleading precision. [299] MILLS, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on January 30, 2006.

A motion to dismiss was heard by *Patrick F. Brady,* J.

*Lisa G. Arrowood (Heidi A. Nadel & J. Owen Todd* with her) for the plaintiffs.

*Harold W. Potter, Jr. (Maura J. Gerhart* with him) for the defendants.

KAFKER, J. A seventeen year old student at Milton Academy, a private school (school), was expelled by the school and charged criminally with statutory rape for receiving oral sex from a fifteen year old female student. Four other boys involved in the same incident, which occurred in the boys' locker room on the school campus, were also expelled and prosecuted, either as juveniles or adults, depending on their ages. The incident was reported in the newspapers and commented upon publicly by the school. The seventeen year old student and his parents[3] brought suit in Superior Court against the school and its former chief administrator, claiming negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of G. L. c. 93A, § 9, defamation, and negligent and intentional infliction of emotional distress. A judge allowed the defendants' motions to dismiss the plaintiffs' claims pursuant to Mass.R.Civ.P. 8(a), 365 Mass. 749 (1974), and Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974). We affirm.

*Background.* The plaintiffs' complaint asserts the following facts. The school is a private college-preparatory school occupying a 125-acre campus. Admission is selective. The school admits boys and girls in kindergarten through grade twelve and offers boarding for students in the upper school (grades nine through twelve). The upper school has approximately 680 students. Tuition for the upper school for the academic year 2004-2005 was $25,675 for day students and $32,725 for boarders. The plaintiff was an upper school day student.

---

[3]We shall refer in the text to the plaintiff-student as the student, and to the student and his parents collectively as the plaintiffs.

According to the school's mission statement, "Milton Academy cultivates in its students a passion for learning and a respect for others." The upper school handbook (handbook) also sets out "Standards, Rules & Regulations." As alleged in the complaint, the school provides a copy of the handbook to every upper school student and his or her parents.

In terms of student conduct, the plaintiffs allege that the handbook provides "that students must keep the school accurately informed of their whereabouts at all times when under the school's jurisdiction." Specific policies govern dormitory room visitation between students of opposite sexes. Alcohol and drug use is prohibited, as are unchaperoned parties. The complaint alleges, however, that "[s]tudents in grades 9 through 12 — over and under 16 years old, day students and boarding students — freely and regularly had sex . . . on campus."

In terms of student discipline, the complaint alleges that "[t]he Handbook also outlines a fairly detailed and well-developed disciplinary process, which includes the use of a Discipline Committee." Although "the head of school reserves the right to determine a disciplinary response without a Discipline Committee, the Handbook indicates that the power is generally used only where there is an immediate threat to another or to the school's property." Finally, the handbook states that "[w]e expect the cooperation of parents in upholding our standards. We believe that parents and the Academy share the task of establishing the right balance of freedom and responsibility, realistically and consistently, for young people." With this background, we turn to the incident at issue.

After dinner on January 24, 2005, the student and a group of his hockey teammates used a pass code to enter the boys' locker room. They were accompanied by the fifteen year old girl, who was also a student at the school. According to the complaint, she was "known by the boys to have performed oral sex on small groups of boys on . . . two prior occasions." In the locker room, she performed oral sex on each of the boys.

School administrators learned of the incident several weeks later and on February 15 or 16, 2005, spoke to the girl involved. No details of this meeting appear on the record, but the girl apparently described the January 24 incident and disclosed the

names of the boys involved. The administrators then met privately with the girl's parents and asked the girl to make a written statement on the incident, but "allowed her to think about and write the statement outside of their presence." She submitted the statement to the school administrators the following day.

The next morning, February 17, 2005, the student and the other four boys involved in the January 24 incident were called out of class and brought to separate rooms. The student was questioned by the school's director of admissions and the assistant dean of students, who also told him to produce a written statement.[4] The school, according to the complaint, "did not give the boys the same opportunity they gave to the girl to consider and write a statement outside of the administration's presence or to take it home and turn it in the next day." The administrators did not inform the student's parents of the incident, nor did they advise him to contact his parents or counsel before he made his written statement.

After the student wrote his statement, the assistant dean of students then advised him to call his parents. The student did so. The student's mother promptly telephoned the assistant dean of students, who told the student's mother that she "did not think [the January 24 incident] would warrant any discipline." The student's father spoke to the dean of students later that day, who told him that it was possible that the student would be expelled.

The following day, February 18, the dean of students informed the student that he had been expelled.[5] The four other boys involved in the January 24 incident were also expelled. That same morning, the school turned the boys' written statements over to the police. The girl received "non-disciplinary administrative leave."

By the next day, February 19, the school had released a prepared statement to the press.[6] The head of school, the defendant Robin Robertson, subsequently wrote two letters (dated February 22 and March 3) to all school parents discussing

---

[4]The other boys were also questioned and told to prepare written statements.

[5]The student's parents hired school faculty to tutor him for the remainder of the school year.

[6]The plaintiffs' complaint does not specify whether this news release was issued proactively or in response to media inquiries. The first article on the

the incident. None of these communications is included in its entirety in the record.

As excerpted in the complaint, the February 22 letter referenced the expected standards of behavior as set out in the handbook:

> "As a community we have, as the handbook says, developed certain standards of conduct fundamental to the education the School provides. We believe that it is incumbent on all of us to hold ourselves to the highest standards, both as members of the community and citizens of a larger world. This behavior, which clearly violates community norms, is simply unacceptable at Milton Academy.
>
> "Furthermore, our handbook states that students are expected to uphold the rights and well being of others. Therefore, impinging on the well being of others is an unacceptable breach of this value."

The February 22 letter explained that those standards had not been met here:

> "Milton Academy cannot tolerate situations in which any individual, regardless of gender, is pressured, consciously or unconsciously to perform sexual acts. The boys participated in a situation that involved a 5 to 1 ratio of boys to the single girl. That by definition represents a pressurized situation, which the boys should have known. It was a situation where coercion, implicit or explicit, was an element of the interaction."

In her March 3 letter to parents, Robertson provided further information to the school community "about a short and unfortunate pattern of behavior by a small group of students":

> "The pattern that ended on January 24 involved two other meetings: four students met on Saturday, January 22, and four met on Sunday, January 23. The first meeting took place in the early evening in a dormitory room; the others took place in the locked locker room in the short interim period between dinner and study hours. The students who participated are those we have already disciplined."

incident appeared in the Boston Globe on the same day, February 19, 2005.

In April, two of the student's sixteen year old teammates involved in the January 24 incident were charged, as juveniles, with statutory rape. On May 31, the student and two other boys involved in the January 24 incident were charged, as adults, with statutory rape. That same day, the three older boys were arraigned in District Court, where a judge approved their plea bargain. Each boy pleaded not guilty and agreed to two years of pretrial probation pursuant to G. L. c. 276, § 87, mandatory counselling, and 100 hours of community service. The boys also apologized twice, in open court, to the girl's family.

In January of 2006, the plaintiffs brought the instant suit against the school and Robertson, alleging negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of G. L. c. 93A, § 9, defamation, and negligent and intentional infliction of emotional distress. Both defendants moved to dismiss, alleging that the plaintiffs' complaint failed to state a claim on which relief could be granted, Mass.R.Civ.P. 12(b)(6), and failed to comply with the requirements of Mass. R.Civ.P. 8. On August 30, 2006, a judge of the Superior Court allowed the defendants' motions and dismissed the plaintiffs' complaint, further ordering that the defendants should recover their costs of action. The plaintiffs appeal.

*Discussion.* In reviewing the dismissal of claims pursuant to Mass.R.Civ.P. 12(b)(6), we accept the plaintiffs' factual allegations as true. "However, we do not accept legal conclusions cast in the form of factual allegations." *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000). On appeal, the plaintiffs do not pursue the dismissal of their claims pursuant to G. L. c. 93A, or for negligent or intentional infliction of emotional distress. We address in turn the merits of their remaining claims on appeal.

1. *Negligence.* The plaintiffs claim that the school and Robertson owed a duty to the student "to use reasonable care to protect [him] while he was on school property or under the school's jurisdiction, control and care." The plaintiffs argue that the defendants breached this duty by inadequately supervising school students and the boys' locker room, failing to advise students of any prohibitions on sexual acts on campus or the criminal laws governing statutory rape, and by questioning the student and

requiring him to prepare a written statement regarding his conduct before advising him to speak to his parents or a lawyer. Essentially, the plaintiffs contend that the school owed the student a duty to protect him from committing the sexual offense here and to refrain from questioning him about it until he consulted his parents or counsel.

The Supreme Judicial Court has addressed the duty of care owed by private educational institutions to students in *Mullins* v. *Pine Manor College*, 389 Mass. 47 (1983) (*Mullins*). In that case, a student who was raped on campus by an unidentified intruder sued the school for negligence. The court derived a duty of due care from "existing social values and customs," *id.* at 51, quoting from *Schofield* v. *Merrill*, 386 Mass. 244, 247 (1982), and a "duty voluntarily assumed" by the college. *Id.* at 52. It determined that "colleges of ordinary prudence customarily" recognize an obligation to provide security and protection from harm for students on their campuses. *Id.* at 51. The court thus held that the college had a duty of care to protect its resident students against reasonably foreseeable criminal acts of third parties. *Id.* at 54.

The plaintiffs contend that the principles articulated in *Mullins*, and the in loco parentis doctrine more generally, provide a cause of action for them. We disagree. In *Mullins*, the plaintiff was the victim, not the perpetrator, of a rape. The opposite is true here as matter of law. A seventeen year old who receives oral sex from a fifteen year old has committed statutory rape in this Commonwealth. G. L. c. 265, § 23. See *Commonwealth* v. *Dunne*, 394 Mass. 10, 19 n.17 (1985) ("The law conclusively presumes that those under sixteen years of age are not sufficiently mature to understand fully the physical, mental, and emotional consequences of sexual intercourse, and are therefore incapable of making a rational decision about whether to consent to such conduct"). Our statutory rape law provides for punishment, not protection, for a seventeen year old for this conduct. Our "social values and customs" also particularly condemn the group sexual activity here, involving five boys and one younger girl.[7] As a result, the student may not recover in tort against the

---

[7]The school fairly described the behavior as a violation of "community norms."

school for his own sexual misconduct. This is true even if the school were lax in its monitoring of its facilities and teenage sexual activity, as the plaintiffs allege.

Nor does the law recognize a general duty on the part of a private school to advise a student to speak to his parents or a lawyer prior to questioning him about a sexual offense and having him prepare a written statement. A private educational institution is "not required to adhere to the standards of due process guaranteed to criminal defendants . . . ." *Schaer* v. *Brandeis Univ.*, 432 Mass. at 482. See *Commonwealth* v. *Considine*, 448 Mass. 295, 300-301 (2007) (searches by private school teachers uncovering drugs and alcohol not governed by protections afforded by Fourth Amendment to United States Constitution as private high school teachers were not acting as State agents). Indeed, absent a contractual commitment to the contrary, schools "have wide discretion in school discipline matters," as discipline is inevitably a part of the education process. *Nicholas B.* v. *School Comm. of Worcester*, 412 Mass. 20, 21 (1992). See *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 19-20 (1983). We therefore conclude that the school did not violate a duty of care when it investigated and documented, without the involvement of the student's parents or counsel, the sexual misconduct that occurred at the school. Not involving the parents or counsel in the investigation was a disciplinary decision, made within the private school's "wide discretion," as was the decision to expel the student. *Nicholas B.* v. *School Comm. of Worcester, supra.* See *Coveney* v. *President & Trustees of the College of the Holy Cross, supra* at 20 (expulsion of student permissible even when other student involved in episode received lesser punishment).

Finally, the school was not responsible in tort for the criminal consequences of the student's actions or the criminal investigation or prosecution that followed the school's internal review, as the plaintiffs seem to allege here. The student's actions and the criminal law defined the criminal consequences; the police and prosecutors, not the school, were responsible for the criminal investigation and prosecution. This was true regardless whether the written statements taken by the school furthered the criminal investigation and prosecution. See generally *Flesner* v. *Techni-*

*cal Communications Corp.*, 410 Mass. 805, 810 (1991) ("it is the public policy of this Commonwealth to encourage cooperation with ongoing criminal investigations"); *Commonwealth* v. *Considine, supra.*

2. *Breach of contract.* The plaintiffs next argue that the school made "promises and representations, express and implied," that constitute a contract between the school and the plaintiffs.

The Supreme Judicial Court established the standards for interpreting contract claims based on school handbooks in *Schaer* v. *Brandeis Univ.*, 432 Mass. at 478-481. Although that case involved a university's handbook, we believe that the same methodology is properly applied to a private, college-preparatory school's handbook. We therefore employ "the standard of 'reasonable expectation — what meaning the party making the manifestation, the [school], should reasonably expect the other party to give it.' " *Id.* at 478, quoting from *Cloud* v. *Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983). Moreover, as is ordinarily the case, "[t]he interpretation of the contract itself generally presents a question of law for the court. . . . Whether or not a contract is ambiguous is also a question of law for the court." *Berkowitz* v. *President & Fellows of Harvard College*, 58 Mass. App. Ct. 262, 270 (2003).

Our task is made more difficult here by the failure of the parties to include the handbook in the record. The plaintiffs provide only scattered extracts from the handbook, often presented in paraphrases. Although we are reviewing under a rule 12(b)(6) standard, "we do not accept legal conclusions cast in the form of factual allegations." *Schaer* v. *Brandeis Univ., supra* at 477.

All that being said, the provisions that are quoted and paraphrased by the plaintiffs do not in and of themselves or together as a whole create any reasonable expectations that have been violated by the school. Specifically, the plaintiffs reference a handbook provision stating that "the school does not approve of unchaperoned parties or parties where alcohol/drug use is permitted, and will not allow students under its jurisdiction to attend such parties." They also rely on a provision that states "that students must keep the school accurately informed of their whereabouts at all time when under the school's jurisdiction." The plaintiffs interpret these provisions to combine to constitute

a "promise" to supervise the campus and to protect students and not harm them. They claim that with regard to the student, this promise was breached by the school and the plaintiffs were thereby damaged.

The handbook provisions speak for themselves. The "reasonable expectations" that they create have not been violated by the school in the instant case. The incident involved here was not an unchaperoned party that the school allowed to occur. This was not an on-campus beer party knowingly condoned by the school. The five boys, accompanied by the girl, used a pass code to enter the boys' locker room in the evening and engaged in behavior that they undoubtedly understood was not acceptable to school officials. See generally Nicholas B. v. School Comm. of Worcester, 412 Mass. at 22 (no advisory rule required for "unquestionably improper" conduct). The students, not the school, were in violation of the handbook.

The plaintiffs also claim that the school violated the disciplinary process articulated in the handbook. The plaintiffs argue first that the school should have convened a discipline committee and not acted through the head of school's reserved right to determine a disciplinary response herself. Although the plaintiffs characterize the reserved right as "generally" being used for immediate threats to person or property, even the plaintiffs' description of the provision allows for its use in other circumstances. Given the sensitivity of the issues, the number of students involved, the possibility of subsequent criminal prosecutions, and the important implications for the school community as a whole, it is neither surprising nor problematic that the head of school exercised her express right to take over the discipline process herself.

The plaintiffs also suggest that the disciplinary process here violated the handbook because the student was not advised to consult his parents or counsel prior to being questioned about his conduct. The handbook provisions referencing parental involvement do not preclude such questioning. The school's statement that it expects the cooperation of parents in upholding its standards does not contain a prohibition against questioning upper school students about serious misconduct before notifying their parents. The same is true for the provision discussing how "parents and

the Academy share the task of establishing the right balance of freedom and responsibility, realistically and consistently, for young people." These provisions do not prevent the school from dealing directly with its students. Rather, they provide for parental involvement and cooperation as the disciplinary process unfolds. The parents here were involved soon after the student was interviewed and his statement was taken, and before he was expelled. Moreover, nearly a month had passed between the time of the incident and the interviews, so the student certainly had time to consult with his parents, had he so desired. While the student's parents may have preferred to be involved in the school's disciplinary process as soon as it commenced, the handbook does not so provide.[8]

Finally, we examine the disciplinary process to "ensure that it was conducted with basic fairness." *Schaer* v. *Brandeis Univ.*, *supra* at 481, quoting from *Cloud* v. *Trustees of Boston Univ.*, 720 F.2d at 725. A private school may not arbitrarily or capriciously dismiss a student or do so in bad faith. *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. at 19. The expulsion of the seventeen year old student was, however, for serious sexual misconduct involving a younger student. The student was given an opportunity to explain his behavior. Both of his parents were informed of the proceedings shortly thereafter. The four other boys involved in the incident were treated similarly in the proceedings and likewise expelled.[9] Nothing alleged here amounts to arbitrary or capricious conduct or actions taken by the school in bad faith. *Ibid.*

3. *Defamation.* The plaintiffs next argue that the school made false and defamatory statements of and concerning the student, both in its interactions with the press and in Robertson's written communications to the school community.

To prevail on a defamation claim, a plaintiff must "establish that the defendants published a false statement about him to a third party that either caused him economic loss or was of the type that is actionable without proof of economic loss" (footnote omitted). *Phelan* v. *May Dept. Stores Co.*, 443 Mass. 52, 55-56

---

[8]Nor does the implied covenant of good faith and fair dealing so require.

[9]The decision to treat the fifteen year old female student very differently is not arbitrary and capricious for the reasons stated throughout this decision.

(2004). The plaintiffs claim that the following statement is false and defamatory:

> "Milton Academy cannot tolerate situations in which any individual, regardless of gender, is pressured, consciously or unconsciously to perform sexual acts. The boys participated in a situation that involved a 5 to 1 ratio of boys to the single girl. That by definition represents a pressurized situation, which the boys should have known. It was a situation where coercion, either implicit or explicit, was an element of the interaction."

The plaintiffs contend that this statement was defamatory because it could be reasonably interpreted to mean that the boys had done something that "coerced or pressured the girl into performing sexual acts."

To determine whether the statements regarding pressure or coercion are defamatory, we must decide whether they are statements of fact or opinion, or a combination of both. This determination, which is "generally considered a question of law," is critical. *Cole* v. *Westinghouse Bdcst. Co.*, 386 Mass. 303, 309, cert. denied, 459 U.S. 1037 (1982). See *Friedman* v. *Boston Broadcasters, Inc.*, 402 Mass. 376, 379 (1988), quoting from *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 709 (1987), cert. denied, 485 U.S. 940 & 962 (1988) ("The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either"). Statements of fact may be actionable, but "pure opinions" are not. *King* v. *Globe Newspaper Co.*, supra at 708. See *Friedman* v. *Boston Broadcasters, Inc.*, supra; *Cole* v. *Westinghouse Bdcst. Co.*, supra at 312.[10]

Opinions are, however, rarely "pure" of facts. We therefore draw distinctions between opinions as well. Opinions clearly based on disclosed, nondefamatory facts are not actionable. See, e.g., *Pritsker* v. *Brudnoy*, 389 Mass. 776, 780 (1983); *Aldoupo-*

---

[10]In drawing the distinction, we focus on whether the assertion can be proved false. *Friedman*, supra at 381-382. *Reilly* v. *Associated Press*, 59 Mass. App. Ct. 764, 769 (2003). Opinions are usually based on far more subjective judgments than ordinary facts. "An assertion that cannot be proved false cannot be held libellous." *Cole*, supra at 312, quoting from *Hotchner* v. *Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.), cert. denied sub nom. *Hotchner* v. *Doubleday & Co.*, 434 U.S. 834 (1977).

*lis* v. *Globe Newspaper Co.*, 398 Mass. 731, 735 (1986); *King* v. *Globe Newspaper Co.*, *supra* at 713; *Friedman* v. *Boston Broadcasters, Inc.*, *supra* at 380; *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 266 (1993). However, "[a] statement cast in the form of an opinion may imply the existence of undisclosed defamatory facts on which the opinion purports to be based, and thus may be actionable." *King* v. *Globe Newspaper Co.*, *supra* at 713. See Restatement (Second) of Torts § 566 comment c, second par. (1977).

"In deciding whether statements can be understood reasonably as fact or opinion 'the test to be applied . . . requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.' " *Cole* v. *Westinghouse Bdcst. Co.*, *supra* at 309, quoting from *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980).

We conclude that the school's statements regarding whether there was pressure or coercion are opinions clearly based on disclosed nondefamatory facts. The accurate factual basis for the discussion is set out in the second sentence of Robinson's statement: "The boys participated in a situation that involved a 5 to 1 ratio of boys to the single girl." The school's statement that sexual relations in these circumstances "by definition represents a pressurized situation, which the boys should have known" follows in the next sentence. The use of the terms "by definition" demonstrates that the school is expressing an opinion about what it means by pressure based on these facts alone. The use of the phrase "should have known" is further proof that the school is expressing its opinion rather than stating an undisclosed fact about the boys. The last sentence is tightly linked to those preceding it, particularly in its continued emphasis on the "situation." In sum, "[t]he logical nexus between the facts and the opinion was sufficiently apparent to render unreasonable any inference that 'the derogatory opinion must have been based on

undisclosed facts.' " *Lyons* v. *Globe Newspaper Co., supra* at 266, quoting from Restatement (Second) of Torts § 566 comment c, second par. See *Pritsker* v. *Brudnoy, supra* at 780; *Aldoupolis* v. *Globe Newspaper Co., supra* at 735; *King* v. *Globe Newspaper Co., supra* at 713; *Friedman* v. *Boston Broadcasters, Inc., supra* at 380. Accordingly, the statements regarding pressure or coercion cannot constitute actionable defamation.

The plaintiffs also claim defamation based on the following statement from Robinson's March 3 letter: "Initially, we thought we were dealing with one event, but after two weeks of following up we now understand that what transpired was a short and unfortunate pattern of behavior by a small group of students. The pattern that ended on January 24 involved two other meetings: four students met on Saturday, January 22, and four met on Sunday, January 23. . . . The students who participated are those we have already disciplined." The plaintiffs contend that the student was defamed by this statement because he was not involved in the January 22 and January 23 encounters, and this statement falsely implied that he was.

"To succeed . . . on an action for defamation, a plaintiff must . . . show that the alleged defamatory statement published by the defendant was 'of and concerning' the plaintiff." *Eyal* v. *Helen Bdcst. Corp.*, 411 Mass. 426, 429 (1991). This can be done in two ways: "either that the defendant intended its words to refer to the plaintiff and that they were so understood, *or* that the defendant's words reasonably could be interpreted to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood." *Id.* at 430, quoting from *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 483 (1985).

The student in the instant case is not mentioned by name in the March 3 communication. Compare *Reilly* v. *Associated Press*, 59 Mass. App. Ct. 764, 777 (2003) (defamatory statement could be found to be "of and concerning" plaintiff, who was "only person identified in the article"). In addition, the stated facts regarding the January 22 and January 23 incidents have not been alleged to be inaccurate. The school listed the number of participants in each incident so that it is clear that not every boy involved in the January 24 incident participated in the earlier incidents. In

this context, we do not think it reasonable to conclude that false and defamatory statements were made regarding the student concerning the January 22 and 23 incidents. See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 785 (1989). We therefore find no actionable defamation in the March 3 statements, and conclude that the defamation claim was properly dismissed.

4. *Failure to comply with Mass.R.Civ.P. 8.* Finally, the plaintiffs allege that the Superior Court judge misapplied the law in dismissing the plaintiffs' complaint for failure to comply with Mass.R.Civ.P. 8(a). Although the rule 8 decision is unessential in light of the rule 12(b)(6) decision, we discern no error here as the complaint shares many of the shortcomings identified in *Schaer* v. *Brandeis Univ.*, 432 Mass. at 477, where the court noted that the judge could have dismissed the complaint pursuant to Mass.R.Civ.P. 8(a).

The complaint in *Schaer* v. *Brandeis Univ., supra*, was "anything but short and plain" as it "sends 125 paragraphs sprawling over thirty-four pages," while the complaint here spans thirty-three pages and includes 126 paragraphs. The complaint here is also "so verbose and confusing that it fails to give the defendants 'fair notice of what the plaintiffs [claims are] and the grounds upon which [they rest].' " *Mmoe* v. *Commonwealth*, 393 Mass. 617, 621 (1985), quoting from *Conley* v. *Gibson*, 355 U.S. 41, 47 (1957). It is very difficult to link particular factual allegations to particular claims, as each count is sketchily described and cross-referenced with all previous and subsequent paragraphs. See *Schaer* v. *Brandeis Univ., supra* ("Each of the seven counts incorporates paragraphs one through 108 in their entirety"). Much of the complaint is also irrelevant, making this task even more difficult.

In sum, we discern no error in the judge's conclusion that the complaint "fails adequately to inform the defendants of the precise nature of the claims against them, and the grounds therefor." See Mass.R.Civ.P. 8(a)(1), (e)(1); *Schaer* v. *Brandeis Univ., supra*.

*Judgment affirmed.*

MILLS, J. (concurring in part and dissenting in part). I agree with the court that the judge properly dismissed the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation, but disagree as to the negligence claim and dismissal under Mass.R.Civ.P. 8(a)(1), (e)(1), 365 Mass. 749 (1974), for failure of pleading precision.

1. *Background.*[1] The plaintiff high school student (student), a seventeen year old minor,[2] was removed abruptly and without notice from his classroom and escorted to a separate confinement. There, he was sequestered from the other student suspects and questioned by the dean of admissions and an assistant dean of students of Milton Academy (school). They coerced the student into making a written confession with no opportunity to first confer with his parents,[3] an attorney, or other adult advisor. The student was, at the time, advised that his statement would be used in the school's disciplinary process. He was not informed that the school would (the next morning) deliver his written confession to the police or that the conduct to which he confessed amounted to statutory rape, a criminal offense with a maximum penalty of life in a State prison. See G. L. c. 265, § 23. The student's written confession was, in fact, delivered to the police on the following morning, and the student was subsequently charged, as an adult, with statutory rape. (I refer to the foregoing interrogation and its aftermath as "the interrogation incident.")

2. *Compliance with Mass.R.Civ.P. 8.* The complaint in this

---

[1]In assessing the plaintiffs' claims on a motion to dismiss, the plaintiffs receive the benefit of the doubt. *Wrightson* v. *Spaulding*, 20 Mass. App. Ct. 70, 72 (1985). A motion under Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), admits, for purposes of the motion, all well-pleaded allegations of the complaint, and the court must also accept as true such inferences as may be drawn from the complaint in the plaintiffs' favor. See *Jones* v. *Brockton Pub. Mkts. Inc.*, 369 Mass. 387, 388 (1975); *Curran* v. *Boston Police Patrolmen's Assn., Inc.*, 4 Mass. App. Ct. 40, 41 (1976). These generous and indulgent criteria are comprehensively reiterated in *Brum* v. *Dartmouth*, 44 Mass. App. Ct. 318, 321 (1998), *S.C.*, 428 Mass. 684 (1999).

[2]Under Massachusetts law, a minor is defined as "any person under eighteen years of age." G. L. c. 4, § 7.

[3]According to the complaint, the parents live less than a mile from the school. Furthermore, the parents' home and work contact information is printed in the school's directory. No one from the school attempted to contact the parents or alert them of the situation.

case is long, containing 126 numbered paragraphs on thirty-three pages. The defendants contended that they were so confused by the complaint that they were unable to respond appropriately to its allegations. However, they were able to delineate and succinctly summarize each of the plaintiffs' claims for purposes of their successful responsive pleadings, and the judge exhibited no difficulty understanding those claims in ruling on the defendants' motions to dismiss.

Massachusetts courts have consistently held that "[t]he rules of civil procedure were designed to facilitate pleading and to eliminate technicalities." *Friedman* v. *Jablonski*, 371 Mass. 482, 488 (1976). Furthermore, when the complaint contains "excessively adjectival allegations," *Charbonnier* v. *Amico*, 367 Mass. 146, 147 (1975), the spirit and tradition of the rules of procedure favor giving "the plaintiffs an opportunity to reframe their complaint" instead of a dismissal. *Id.* at 153-154.

Despite the complaint's length and unnecessary editorial comment, it fairly notified the defendants of the claims against them and the grounds supporting those claims, and thus, in my view, it was error to dismiss the complaint under rule 8. "[D]ismissals on the basis of pleadings, before facts have been found, are discouraged." *Gennari* v. *Revere*, 23 Mass. App. Ct. 979, 979 (1987). See *Afarian* v. *Massachusetts Elec. Co.*, 449 Mass. 257, 269·(2007), quoting from *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 289 (1977) ("[T]he expressed tendency is in favor of allowing amendments").

3. *Negligence.*[4] The plaintiffs' negligence claims include an assertion that the school acted unreasonably as to the interrogation incident. The plaintiffs argue that the school had a duty to use reasonable care to protect the student while he was under the school's authority, and not to expose him unnecessarily to harm. ·While acknowledging the defendants' right to investigate the locker room incident and to take appropriate disciplinary action, they argue that the school did not enjoy license to do whatever it wished at whatever cost to the student or parents, even though the behavior of the student was criminal and violated the school's legitimate rules.

---

[4] I concur with the court in all aspects of the negligence claim other than the interrogation incident.

The defendants, in arguing the absence of duty, correctly note that there is no Massachusetts case precisely on point to support the claim that the school has a duty to protect the student from his unlawful acts.[5] However, the defendants misstate (or misinterpret) the plaintiffs' claims. The plaintiffs do not assert that the school has a duty to protect the student from his unlawful acts.[6] Rather, they argue that the school must act responsibly when dealing with student misconduct, and must act reasonably in balancing the student's interests and the school's interests, particularly in view of the school's emergency efforts to manage its public relations problems. The plaintiffs' allegation that the school breached a duty of reasonable care as to the interrogation incident was, in my view, sufficiently alleged in count I of the complaint to survive a motion to dismiss under Mass. R.Civ.P. 12(b)(6), 365 Mass. 755 (1974).

It is settled that the question whether the defendants acted reasonably "is one of fact for the jury," *Zezuski* v. *Jenny Mfg. Co.*, 363 Mass. 324, 327 (1973), while the question of "whether there is a duty to be careful is a question of law." *Yakubowicz* v. *Paramount Pictures Corp.*, 404 Mass. 624, 629 (1989). In this case, the judge noted that schools have a general duty to protect their students from foreseeable harm, but commented that no case law supports the plaintiffs' assertion that the interrogation incident violated any recognized duty the school had to the plaintiffs. Other than a passing reference to *Mullins* v. *Pine Manor College*, 389 Mass. 47 (1983) (*Mullins*), the judge cited no case law eviscerating the school's general duty to the plaintiff student. The defendants argue that *Mullins* does not support the

---

[5]The defendants suggest that *Schaer* v. *Brandeis Univ.*, 48 Mass. App. Ct. 23, 30 (1999), *S.C.*, 432 Mass. 474 (2000), contradicts the plaintiffs' negligence claims. I disagree. Among other things, the *Schaer* case involved a *university's* relationship with its student, and in contrast, the student here is in high school. Further, the claim in that case is based in contract.

The more recent case of *Commonwealth* v. *Considine*, 448 Mass. 295 (2007), is similarly unpersuasive. That case addresses a completely different question as to grounds for suppression of evidence in a criminal case, and essentially holds that the actions of parent-chaperones and private school employees are not actions that are within the protection of the Fourth Amendment to the United States Constitution. *Id.* at 298-299.

[6]I do not agree with the court's articulation of the plaintiffs' complaint as it pertains to the interrogation incident.

plaintiffs' position, but they offer no persuasive authority to contradict the existence of a duty in these circumstances.

According to well established principles of tort law, "everyone has a duty to refrain from affirmative acts that unreasonably expose others to a risk of harm." *Yakubowicz* v. *Paramount Pictures Corp.*, 404 Mass. at 629. See Restatement (Second) of Torts § 302 comment a (1965) ("[A]nyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act"). In this case, the school took multiple affirmative acts in the interrogation incident, and tort law clearly mandates that in performing these acts the school had a duty to exercise reasonable care.[7] Well-settled principles of tort law therefore convince me that the plaintiffs in this case have pleaded a sufficient duty which is applicable to the interrogation incident.[8]

Furthermore, Massachusetts case law supports the notion that

___

[7]The judge performed no analysis under traditional tort law, nor under the recent cases of the Supreme Judicial Court which iterate criteria for determining the existence of a duty.

> "The concept of duty . . . is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists. The assertion that liability must . . . be denied because defendant bears no duty to plaintiff begs the essential question — whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. [A] duty finds its source in existing social values and customs, and thus imposition of a duty generally responds to changed social conditions."

*Afarian* v. *Massachusetts Elec. Co.*, 449 Mass. at 261-262, quoting from *Jupin* v. *Kask*, 447 Mass. 141, 146 (2006) (citations omitted).

Thoughtful analysis is, in my view, especially necessary when volatile issues involving sex, power, criminal violations, and outrageous behavior are components of the relationship between a secondary school and its minor student.

[8]In this regard, I disagree with the court's contention that it cannot be a tort to provide assistance in a criminal investigation. While the law and established public policy support cooperation with law enforcement authorities, they do not support illicit methods, coercion of minors, or breach of duty. And while the protections of the State and Federal Constitutions against coerced confessions are not *directly* applicable here, the societal abhorrence of such coercion

secondary schools owe a duty of care to their students, see, e.g., *Alter* v. *Newton*, 35 Mass. App. Ct. 142, 149 (1993) (holding that the plaintiff was "a student to whom [the city] owed a duty of care"), and also the specific notion that there is a "special relationship that exists between a school and its students." *Sharon* v. *Newton*, 437 Mass. 99, 110 n.12 (2002). The existence of a duty that secondary schools owe to minor children is further supported by the special protections that both the courts and the Legislature have long accorded to minors,[9] and by the doctrine of in loco parentis.[10]

I would reverse the judgment insofar as it dismissed the complaint on the basis of a rule 8 violation, and on the negligence count. I concur in the court's opinion in all other respects.

---

need not be ignored.

Furthermore, notwithstanding the school's duty to report the sexual abuse to the Department of Social Services under G. L. c. 119, § 51A, I am of the view that the plaintiffs have sufficiently alleged harm to at least pass muster on a motion to dismiss under rule 12(b)(6). The significance of a signed confession in a criminal investigation and prosecutorial decision is, in my view, unquestionably relevant to the issue of harm.

[9]See, e.g., G. L. c. 10, § 34 (payment of prize money to minors); G. L. c. 278, § 16A (exclusion of public from trial for sex offenses involving minors under age of eighteen); *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 132 (1983) (reiterating that Massachusetts courts have long recognized that minors are afforded a "unique and protected status" and thus "the law presumes different levels of responsibility for juveniles and adults"); *Carey's Case*, 66 Mass. App. Ct. 749, 754 (2006) (explaining the special protections afforded to minor employees under G. L. c. 149).

[10]Notwithstanding dicta in *Mullins*, 389 Mass. at 52, noting a general decline of the theory that a college stands in loco parentis, the doctrine is relevant to this case and in my view supports the plaintiffs' duty argument. Compare *Commonwealth* v. *A Juvenile*, 389 Mass. at 134 (with child age fourteen or over, the "assumption that an informed parent, or person standing in loco parentis, will be better able to understand the child's rights" better than the child would alone); *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 383 (2003) (adult with whom a suspect underage fourteen consults about waiver of rights must "be someone with a relationship with the juvenile who 'is sufficiently interested in the juvenile's welfare to afford the juvenile appropriate protection' ").