# United States Court of Appeals
## For the First Circuit

No. 15-1154

MEGON WALKER,

Plaintiff, Appellant,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE, also known as
Harvard Corporation, ELLEN COSGROVE, LLOYD WEINREB,

Defendants, Appellees,

BRADLEY HAMBURGER, LINDSAY KITZINGER,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Rya W. Zobel, U.S. District Judge]

Before

Thompson and Kayatta, Circuit Judges,
and Mastroianni,* District Judge.

John J.E. Markham, II, for appellant.
Daryl J. Lapp, with whom Elizabeth H. Kelley was on
brief, for appellee.

October 24, 2016

---

* Of the District of Massachusetts, sitting by designation.

**MASTROIANNI**, <u>District Judge</u>.  Between 2006 and 2009 Megon Walker ("Walker") attended Harvard Law School ("HLS").  Walker was a member of the staff of a student-run law journal, the Journal of Law and Technology ("JOLT").  During her final semester at HLS, Walker delivered a draft article (the "Note") to senior staff of JOLT.  After concerns arose among the senior staff regarding the Note, an investigation was launched by HLS.  The HLS Administrative Board (the "Board") subsequently held a hearing and found the Note contained plagiarism in violation of the HLS Handbook of Academic Policies (the "Handbook").  Walker received a formal reprimand and a notation regarding the matter was added to her transcript. Despite the reprimand, Walker graduated on time from HLS.  However, after the notation was placed on her transcript, at least one law firm rescinded a lucrative offer of employment.

Seeking to have the notation removed from her transcript, Walker initiated this suit asserting claims for breach of contract and defamation against the President and Fellows of Harvard College ("Harvard")[1]; Ellen Cosgrove ("Cosgrove"), then-Dean of Students at HLS; and Lloyd Weinreb, a Professor at HLS and Chair of the Board in 2009 (together "Defendants").[2]  After the

---

[1]  This entity has ultimate authority over HLS and the conferral of degrees.

[2]  Initially, the two students who were co-Editors-in-Chief of JOLT, Bradley Hamburger ("Hamburger") and Lindsay Kitzinger ("Kitzinger"), were also named as defendants.  Walker filed a

completion of discovery and a stipulation of dismissal as to some claims, Defendants filed their Motion for Summary Judgment. The district court granted summary judgment for Defendants on all counts and dismissed the action. Walker has appealed the ruling on two of the counts. After reviewing the issues de novo, we affirm.

## I.    Background

Walker initiated this suit in May 2012. Jurisdiction is based on diversity and the claims are brought under Massachusetts law. Four counts were pending when Defendants filed their Motion for Summary Judgment: Count I – breach of contract against Harvard based on the Board's finding that Walker had sufficiently "submitted" the Note for it to be covered by the Handbook; Count II – breach of contract against Harvard based on alleged failures of the Board to comply with provisions in the Handbook; Count IV – defamation based on the inclusion of the plagiarism findings in Walker's HLS transcript; and Count VI – asserting an entitlement to injunctive relief.[3] Walker has appealed only the district court's grant of summary judgment as to Counts I and IV. We,

---

stipulation of dismissal as to all claims against them before Defendants filed their Motion for Summary Judgment.

[3] Count III and Count V were resolved by stipulation of dismissal before the motion for summary judgment was filed.

therefore, set out the facts we deem relevant to those counts in the light most favorable to her and draw all reasonable inferences in her favor.  See Martinez v. Petrenko, 792 F.3d 173, 175 (1st Cir. 2015).

A. Preparation of the Note

As a first year student at HLS, Walker joined the staff of JOLT.  Walker first worked as a "sub-citer," checking citations against their original source material.  During her last year of law school, Walker applied to write a comment for JOLT on a recently decided patent case.  Her application was accepted and she commenced work on the comment, which was to be published in the spring of her third year.

Upon acceptance of her application, JOLT informed Walker that an initial complete draft of the Note would be due on February 1, 2009.  The deadline for the final draft of the Note was February 22, 2009.  Walker understood that the piece she turned in on (or after) the February 22, 2009 deadline would be subjected to the rigorous editing and citation-checking process she had helped with as a sub-citer.  As that process normally unfolded, an author was not permitted to make changes to an article during the editing and citation-checking process.  At the conclusion of that process, authors were permitted to make limited changes prior to publication.

Walker delivered a first draft of the Note to JOLT on February 2, 2009. She turned in a second draft on February 8, 2009, and a third draft on February 16, 2009. Around the time the third draft was due, Walker began experiencing problems with her laptop. On the day she sent the third draft to JOLT, her laptop was infected with a computer virus. While working on her computer with IT support, Walker saw Anna Volfstun ("Volfstun"), JOLT's Submissions Editor. She told Volfstun about the virus and explained that due to the virus, the Note would require significant additional work to be made ready for publication. The next day, on February 17, 2009, Walker attended a JOLT student writing committee meeting where she discussed the virus causing her to lose data from her computer.

On February 20, 2009, Doug Kochelek ("Kochelek"), the JOLT editor in charge of student articles, sent an email to remind Walker and other students their final draft articles were due on February 22, 2009. Kochelek said the articles would be "subcited" the following weekend before being returned "after spring break for [authors'] last round of review with opportunity for changes." Walker responded, via email, on February 22, 2009: "I doubt that I can send [the Note] before 10 tonight. Footnotes and proofreading are taking all weekend." When Kochelek asked Walker when she would be sending the Note, she replied it would be that

night.  She also wrote "I'm over the length limit again and cutting more."


B. Concerns Regarding the Note

On February 24, 2009, two days after Walker said she would send the Note to JOLT, she sent an email to Kochelek and other JOLT senior staff, which read: "Here's the latest draft of the . . . piece.  Sorry about the delay. Let me know if you have difficulty finding any sources."  The piece was still over the word limit.  Walker subsequently met with Andrew Ungberg ("Ungberg"), the line editor responsible for part of the citation-checking process.  During that meeting Walker gave Ungberg two electronic files that contained versions of her sources obtained from Westlaw.  She told Ungberg about the virus on her computer, indicating her draft had problems, including issues with citations and quotations, and she would need to "go back to the sources and compare the arguments . . . and quotations."  Walker also sent an email to JOLT staff on February 27, 2009, stating that she continued to work on the Note after having provided the final draft on February 24, 2009.

In early March, when JOLT staff began editing the Note, concerns arose that much of Walker's argument was derivative of the dissent in the case about which she was writing.  The Article Editor for the Note prepared a summary of the draft for comparison

with other publications and Ungberg compared the Note with the dissent from the case. On March 11, 2009, Volftsun, the JOLT staffer who had spoken with Walker at the IT Help area on February 16, 2009, sent an email offering to help Walker fix issues with the Note. Around the same time, Hamburger used Google to run searches on full sentences from the Note. He created an annotated version of the Note showing which sentences were copied from other sources. He stopped after documenting 23 instances. In mid-March, Hamburger and Kitzinger discussed their attribution concerns with Walker and then with Cosgrove, the Dean of Students.

C. HLS Review and Disciplinary Process

Cosgrove referred the Note to the Board, which reviewed the matter and considered whether to move forward with a charge of plagiarism. The plagiarism policy of HLS reads in part as follows:

> All work submitted by a student for any academic or non-academic exercise is expected to be the student's own work. In the preparation of their work, students should always take great care to distinguish their own ideas and knowledge from information derived from sources. . . . Students who submit work that is not their own without clear attribution of all sources, even if inadvertently, will be subject to disciplinary action.

After the Board voted to move forward with the plagiarism charge, Walker was notified. The Board consulted with Walker's attorneys and scheduled a hearing for May 7, 2009. Although Walker

sought to resolve the situation without a hearing, she was told the plagiarism charge was too serious to be resolved informally. Following the hearing, the Board issued Walker a formal reprimand which ultimately appeared on her transcript and caused the loss of an employment offer.[4]

## II.  Standard of Review

"Summary judgment is appropriate when the record shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  "A genuine issue is one that can 'be resolved in favor of either party' and a material fact is one which 'has the potential of affecting the outcome of the case.'" Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013) (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)). "We review de novo the grant of a motion for summary judgment." Farmers Ins. Exch., 632 F.3d at 782.  "[W]e may affirm the entry of summary judgment on any ground made manifest by the record, so long as the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

---

[4] Suspension is the normal punishment following a finding of plagiarism.

as a matter of law."  Batista v. Cooperativa De Vivienda Jardines De San Ignacio, 776 F.3d 38, 42 (1st Cir. 2015) (citations omitted).

## III. Discussion

The parties agree the Student Handbook sets out the terms of a contract between Walker and HLS.  We proceed under that assumption, applying Massachusetts law to interpret the Handbook.[5] See Cloud v. Trs. of Boston Univ., 720 F.2d 721, 724 (1st Cir. 1983); Schaer, 735 N.E.2d at 378.

Where, as here, a private-school student or former student sues a school alleging breach of contract, the standard of reasonable expectation applies.  Schaer, 735 N.E.2d at 378; see also Driscoll, 873 N.E.2d at 1185-86.  Under this reasonable expectation standard, courts ask, in interpreting the contractual

---

[5] Because HLS does not dispute that the Handbook sets out the terms of a contract, we assume without deciding that a contract exists.  We note, however, that while courts have treated student handbooks as contracts between students and schools, the question of whether such a document always constitutes a contract is, arguably, an unsettled issue under Massachusetts law.  Compare Pacella v. Tufts Univ. Sch. of Dental Med., 66 F. Supp. 2d 234, 240 (D. Mass. 1999) (noting that "[w]hether a student handbook can supply the terms of the contract between a university and its students is unclear under Massachusetts law"), with Driscoll v. Bd. of Trs. of Milton Acad., 873 N.E.2d 1177, 1185 (Mass. App. Ct. 2007) (deciding to treat school's student handbook as a contract); see also Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000) (assuming without deciding that the student handbook gave rise to a contractual relationship between the student and the school).

terms, "what meaning the party making the manifestation, the university, should reasonably expect the other party [, the student,] to give it."  Schaer, 735 N.E.2d at 378 (quoting Cloud, 720 F.2d at 724).  A breach of contract is established if the facts show that the university has "failed to meet [the student's] reasonable expectations."  Id.

Walker argues here, as she did below, that she reasonably expected that the word "submit" in the HLS plagiarism policy meant yielding or surrendering completed work to the will of another. The record, she asserts, establishes that, although she acquiesced to the JOLT senior staff's demands and emailed them her incomplete draft, she intended at some point in the future to go back and insert the missing citations.[6]  No student in her shoes, Walker claims, would reasonably have expected that turning in a draft in

_____

[6] We credit Walker's claims that she only emailed her draft to JOLT senior staff when they insisted, saying, "We need your draft. . . .  [E]very other student author has gotten their piece in", and that her communications with the student editors made it otherwise clear that she intended to continue to make changes.

Specifically, on February 22 (the original deadline for the Note), Walker told the student editors in an email, "I doubt that I can send it before 10 tonight. Footnotes and proofreading are taking all weekend," and on February 24, as she finally prepared to send in the Note two days late, she emailed to say, "ok, sending it out now. All the sources are included, but I'm still moving words around," and then later described the attached document as "the latest draft" (and not the final draft).  Finally, on February 27, after the Note was turned in, Walker emailed again to ask, "I'm still getting comments/feedback from partners at [a law firm]. If I send a revised copy TONIGHT, [i]s that too late??? . . . Did you guys pull sources already?"

such an incomplete state would have constituted "submitting" the draft for purposes of the plagiarism policy.  But even viewing all the facts in the light most favorable to Walker, we conclude that no student could reasonably have believed that the HLS plagiarism policy did not apply to her February 24 Note, and thus summary judgment for HLS was proper.

By its terms, the HLS plagiarism policy applied to "[a]ll work submitted by a student for any academic or non-academic exercise," regardless of intent.  The policy uses the qualifier "all" to modify the phrase "work submitted," and goes so far as to state that the plagiarism ban applies, even if an attribution error was "inadvertent[]."  Given such broad language, we think it clear that the plagiarism policy applied to Walker's work turned in for the exercise of preparing a student note for publication, regardless of whether the work was in draft or final form.

Even if, as Walker argues, the facts establish that she, indeed, believed her Note was badly incomplete, they do not establish that a student could reasonably expect that the words "[a]ll work submitted" exempted such an incomplete draft. There is no evidence, for example, that the terms "[a]ll work submitted" were "word[s] of art," or that they otherwise had "acquired any secondary meaning" in this context.  Lyons v. Salve Regina Coll., 565 F.2d 200, 203 (1st Cir. 1977) (applying the reasonable expectation standard to a Rhode Island case involving a student

- 11 -

manual dispute between a student and a college).  The evidence proffered by Walker proves only that her own intentions were to go back and insert attributions for the uncited passages.  It does not establish any "rational basis for believing that the word[s in the plagiarism policy] . . . meant anything other than [their] normal, everyday meaning."  Id. at 202-03.

Thus, because the record, even viewed in the light most favorable to Walker, gives us no basis on which a reasonable student could have interpreted the words "[a]ll work submitted" any differently, we give them their plain meaning here.  In this case, Walker turned in the fourth draft of her Note (the draft in question) to JOLT senior staff for citation checks.  Unlike with her preliminary drafts, this draft was slated to go directly into the subciting process, and there was to be no opportunity to make changes until the post-check "author edit" period at the end of March.  No reasonable student could have expected that turning in a draft, even a woefully incomplete one, for this citation-check deadline did not constitute "submitting" the draft for the exercise of student publication.

Finally, to the extent that Walker argues that her communications with JOLT senior staff, in which the editors acknowledged that her draft was in rough shape, gave her reason to expect that the HLS plagiarism policy would not apply to the Note, such an argument must also fail.  The contract in question is one

- 12 -

between Walker and HLS.  Although members of the JOLT senior staff may have had discretion to respond with some flexibility to citation issues in student-authored work, no student could reasonably expect that the student editors could somehow have exempted Walker from being held to the HLS plagiarism policy once her work was before the Board.  See Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998) (finding it reasonable for Brown to expect its students not to rely on oral statements by faculty or administrators as binding promises by the university when such statements ran contrary to its school catalog).

## IV. Conclusion

Walker has not presented facts a student could have relied upon to form a reasonable expectation that the plagiarism policy had the meaning she is asserting.  The HLS plagiarism policy refers to "[a]ll work submitted," a phrase that on its face applies to any student work for any academic or nonacademic exercise, whether in draft or final form, turned in to an instructor or student editor of an extracurricular law journal.  We affirm the district court's grant of summary judgment to Defendants on Count I.  Walker's failure to prevail as to Count I undermines her arguments with respect to the defamation claims she made in Count IV.  We, therefore, also affirm the district court's grant of summary judgment to Defendants on Count IV.